IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DESMEN NORTHINGTON,

    Plaintiff,

    v.

Chicago Police Officers NICU TOHATAN, MARIO FUENTES, and JOSEPH VECCHIO, and CITY OF CHICAGO, a Municipal Corporation,

    Defendants.

Case No. 24-cv-11466

*Jury Trial Demanded.*

# COMPLAINT

NOW COMES Plaintiff, DESMEN NORTHINGTON, by and through his attorney, LAW OFFICE OF JORDAN MARSH LLC, complaining of the Defendants, Chicago Police Officers NICU TOHATAN, MARIO FUENTES, and JOSEPH VECCHIO, and CITY OF CHICAGO, and states the following:

## JURISDICTION AND VENUE

1. This action arises under the Constitution of the United States, particularly the Fourth and Fourteenth Amendments to the Constitution of the United States, under the laws of the United States, particularly the Civil Rights Act, Title 42 of the United States Code, §§ 1983 and 1988, and under the laws of the State of Illinois.

1

2. The jurisdiction of this Court is invoked under the provisions of Title 28 of the United States Code, §§ 1331 and 1343. Plaintiff also invokes the supplemental jurisdiction of this Court pursuant to Title 28 of the United States Code, Section 1367.

3. This Court has jurisdiction over this action pursuant to Title 28 of the United States Code §§ 1331 and 1367, as Plaintiff asserts claims under federal law and the state law claims arise out of the same facts as the federal claims. Venue is proper in the United States District Court for the Northern District of Illinois under Title 28 of the United States Code, § 1391(b)(2), as the events complained of occurred within this district.

**PARTIES**

4. At all times relevant herein, Plaintiff DESMEN NORTHINGTON (hereinafter "Desmen") was a resident of Chicago, Cook County, and resided in the Northern District of Illinois.

5. Defendants TOHATAN, FUENTES, and VECCHIO ("Defendant Officers") are sued in their individual capacities and were at all times relevant, sworn tactical police officers employed by Defendant CITY OF CHICAGO, and were acting within the scope of their agency, service and/or employment with the CITY OF CHICAGO, and were acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Illinois.

6. Defendant, CITY OF CHICAGO, is a government entity operating within the State of Illinois. The CITY OF CHICAGO is responsible for the actions of its employees while acting within the scope of their employment. At all times relevant to this action, CITY OF CHICAGO was the employer of Defendants TOHATAN, FUENTES, and VECCHIO.

**FACTS**

7. This matter arises from an unlawful traffic stop by Chicago police of an African-American motorist named Desmen Northington.

8. The stop led to an unlawful detention in which Desmen was forcibly yanked out of the car, subjected to excessive force, handcuffed and detained for more than 10 minutes while being insulted, mocked and threatened by numerous officers.

9. The unlawful stop was based on Desmen's alleged failure to have his hazard lights activated in a stopping zone, which should have resulted in nothing more than a parking ticket.

10. Yet Desmen was subjected to a harrowing encounter with police, who intentionally escalated a minor parking infraction to an unlawful detention, continuously insulted and berated him, threatened to get him fired and to have his Concealed Carry License revoked, illegally searched his car, and then falsified a report to justify their conduct.

**The Incident**

11. On September 23, 2024, at approximately 7:06 p.m., Desmen was in his vehicle, which was stopped in a standing zone at or near 147 East Superior Street in Chicago, Illinois.

12. Desmen had just returned to his car from a nearby store and was inputting his friend's address into the map/GPS function of his phone.

13. Defendant officers drove past Desmen, saw that he was black, then pulled their squad car in front of Desmen's car.

14. Defendant Officers approached Desmen, who lowered his window.

15. Desmen had his phone in his right hand and was lowering his window with his left hand.

16. Tohatan pointed his flashlight at Desmen and informed him he was supposed to have his flashers on.

17. As Desmen began to speak, Tohatan cut him off and asked Desmen if he was the owner of the car.

18. Desmen confirmed it was his car.

19. Desmen informed Tohatan that he just got back from a nearby store and pointed to a bag in his passenger seat.

20. Tohatan asked to see Desmen's license and insurance.

21. When Desmen asked why he needed to show his license and insurance, Defendant Fuentes said, "You're being stopped by the police, so we're requesting your license and insurance – can you roll the windows down on your vehicle?"

22. "For what – what's the issue?" asked Desmen.

23. Tohatan said, "You're parked in a tow zone with no flashers. Can I see your license and insurance."

24. Desmen reached into his front pocket and retrieved his driver's license and insurance card. While he was doing this, Tohatan said, "Lower the windows down, please."

25. "There's no one else in the vehicle", said Desmen.

26. Fuentes knocked on Desmen's rear window and said "[w]e gotta be able to see, roll down your windows."

27. Desmen, who was still attempting to provide his license and insurance to Tohatan, said again, "[t]here's no one else in the vehicle".

28. Fuentes said, "Come on out then."

4

29. When Desmen objected and requested a sergeant, Fuentes opened the driver's door and said, "Come on out or we'll rip you out."

30. When Desmen hesitated, Fuentes grabbed Desmen and began to jerk him out of the car.

31. Desmen exited his car, and the officers grabbed him and turned him around and began to handcuff him behind his back.

32. As Tohatan began to handcuff Desmen, and the officers held him against his car, Desmen said, "I'm not doing anything!"

33. "Then listen!" yelled Fuentes furiously. "When we say get out you get out!"

34. "I asked you for a license three times," said Tohatan. "You ask me why I'm asking for your license, are you stupid?"

35. Once Desmen was handcuffed, Fuentes said, "You're going to jail."

36. "He was moving his hands when I walked out of the car," said Tohatan to the other officers.

37. Tohatan and other officers proceeded to search the interior of Desmen's car after Desmen was walked to the curb.

38. When Desmen said he had the right to question why he was being asked to produce his license and insurance, Fuentes said, "No! You don't have the right! You have the right to go to jail!"

39. Fuentes told Desmen his father should have raised him better.

40. Tohatan began screaming at Desmen as he sat on the curb in handcuffs. "We're the police, when we're telling you 'Roll the windows down, you roll the windows down," he yelled. "When

5

asked for a license you give me a license you're not asking me this is not a stop," he continued. "It's a license insurance. Three times I ask you!"

41. Desmen corrected Tohatan: "No you didn't, you asked me twice and I said –"

42. Tohatan cut off Desman: "That's enough!" he yelled. "I don't have to ask you twice!"

43. Meanwhile the officers continued to illegally search Desmen's car.

44. Vecchio removed a bottle of tequila from Desmen's trunk – where it was legally stored – and emptied it out on the street.

45. "Guess you're gonna learn to listen today, man", said Vecchio as he unzipped a duffel in Desmen's trunk and dumped its contents out.

46. When Desmen requested a sergeant to be called to the scene, Vecchio refused, saying sarcastically, "Yeah, I'm going to start listening to everything that you want me to do."

47. Fuentes chimed in: "Yeah, right. You don't want to listen to us but we gotta listen to you?"

48. "When we say roll down the windows, you roll 'em down – you don't question us", said Fuentes.

49. The search revealed no contraband or other evidence of criminal conduct.

50. Vecchio approached Desmen, who was still sitting on the curb in handcuffs, and said, "Wait, man, you got your CDL [Commercial Driver's License]? And you got all the liquor? You drive for a living and you're gonna act like this with all the liquor?"

51. When Desmen tried to answer, Vecchio cut him off: "Really – how 'bout you lose your job today?"

52. "Are you sorry?" Vecchio asked Desmen.

53. When Desmen said "No" and tried to explain that he was just trying to put his friend's address into his GPS, Vecchio slammed Desmen's trunk shut and said, "Wrong answer."

54. "You're a punk", Vecchio said.

55. Desmen said, "I'm what?"

56. "A punk", said Vecchio.

57. "And you've got a CCL [Concealed Carry License]?" Vecchio asked Desmen incredulously.

58. When Desmen answered that he did have a CCL, Vecchio said, "I think we're gonna revoke that after this. For this behavior. That's bad behavior. Scary behavior."

59. "You're a clear and present danger to society," said Fuentes.

60. "This is bad behavior", said Vecchio – again. "Really bad."

61. Fuentes falsely claimed Desmen's license plates were expired.

62. As Desmen protested, Fuentes said, "Dude, we do this about 100 times a night. You think you're the only one?"

63. As the officers continued to lecture and berate Desmen, Vecchio said, "You started all the problems. You started it all."

64. Later, as Desmen tried to explain why he was so stunned by the officers' conduct, Vecchio laughed, and said, "You're so dramatic and theatrical, man."

65. Defendant officers claimed Desmen had "liquor all over", speculated aloud that Desmen was intoxicated, and later claimed that one of the officers "smelled a strong odor of alcoholic beverage emanating from the vehicle".

66. Despite this, Defendant Officers never gave Desmen a breathalyzer or conducted any sobriety tests.

67. Vecchio released Desmen from his handcuffs.

68. Before he finished removing the handcuffs, Vecchio asked Desmen – again – if he was sorry.

69. Fuentes acted like he was upset that Vecchio was releasing Desmen. "I would take him to jail. I'm gonna walk away", he said sarcastically. "I feel so absurd after this."

70. After all of the yelling, and the false accusations that Desmen was intoxicated, that there was liquor all over his car, that he was "a clear and present danger to society", that Desmen should lose his job and have his licenses revoked, the officers released Desmen without charging him with a crime or even writing him a parking ticket.

71. Ultimately, it took five or six tactical police officers and two squad cars more than 10 minutes to handle an alleged parking infraction that did not even result in a ticket.

## The False Report

72. One or more of the Defendant Officers completed an Investigatory Stop Report ("ISR") that was riddled with falsehoods.

73. Defendants claimed in the ISR that they pulled up in front of Desmen's stopped car (as opposed to behind the car) "in an attempt not to block traffic on the one way street".

74. This rationale was obviously false, for several reasons:

   a. There were several car lengths of space immediately behind Desmen's car where the officers could have parked or stopped without obstructing traffic.

   b. When the officers pulled in front of Desmen's car, they parked at an angle with the rear of their SUV sticking out into a moving traffic lane.

   c. After the initial approach by Defendant Officers, another police SUV parked behind Desmen's car in a moving lane, completely blocking the lane.

8

      d. Officers are trained to pull up and approach vehicles from behind for officer safety.

75. Defendant Officers' statement that they pulled up in front of Desmen to avoid blocking traffic was an obvious pretext for the real reason: so they could see if Desmen was black before they decided whether to approach and detain him.

76. Defendant Officers claimed in the ISR that they observed Desmen "reaching towards the back seat area and making furtive movements downwards."

77. This was false. Desmen never reached towards the back seat or made furtive movements downwards. He was clearly sitting up in his seat, holding his phone with his right hand and lowering the window with his left hand as the officers approached.

78. Defendant Officers falsely claimed in the ISR that Desmen refused to produce his driver's license and insurance.

79. In fact, Desmen was complying with the request for his license and insurance – pulling them out of his pocket and preparing to hand them to Tohatan – when Tohotan ordered him to lower his windows at the same time.

80. Defendant Officers claimed in the ISR that they "assisted" Desmen out of his car "in an attempt to avoid an escalation", when in fact Fuentes forcefully yanked him from the driver's seat and needlessly escalated the situation.

81. Defendant Officers claimed in the ISR that they found a bottle of tequila in "the immediate reachable area of the vehicle."

82. This too is false. The bottle of tequila was in the trunk of the car. The officers could not reach the bottle from the back seat, even after they pulled one of the seats down. Instead, they had to open the trunk itself to get to the bottle.

83. Defendant Officers stated in the ISR that "several police officers explained to the driver on scene that his behavioral [sic] will not be tolerated on the public way."

84. This was true to a point. Defendant Officers spent much of the detention mocking and lecturing Desmen about listening to and complying with the police and not asking questions.

85. After Defendant Officers released Desmen and left the scene, his car was a mess. Tylenol pills were scattered throughout the front seat area, mail had been opened, and bags had been dumped out.

### CPD's longstanding pattern and practice of racially discriminatory traffic stops

86. Chicago police have a longstanding practice of disproportionately targeting Black and Hispanic drivers for traffic stops.

87. In a class action lawsuit filed against the City of Chicago last year by the American Civil Liberties Union, plaintiffs claim that traffic stops in Chicago skyrocketed after 2016 while stops throughout the rest of the state remained stable.[1]

88. The *Wilkins* lawsuit is based in large part on data from the City's Office of Emergency Management and Communications (OEMC), and the Illinois Department of Transportation (IDOT).

89. The *Wilkins* plaintiffs allege that "[s]ince 2016, CPD officers have targeted Black and Latino drivers with extremely high volumes of traffic stops, frisks, and searches, not for the purpose of enforcing traffic laws but to investigate, harass, and intimidate community members (also called "pretextual" stops) on the basis of race and national origin (the "mass traffic stop program")."[2]

---

[1] *Wilkins v. City of Chicago,* 23-cv-4072, Dkt. 87, ¶ 498.
[2] *Id.* at ¶ 2.

90. The *Wilkins* plaintiffs allege further that CPD's pretextual traffic stops follow a typical pattern:

> CPD officers pull over a Black or Latino driver for an alleged minor traffic infraction… Regardless of whether the alleged infraction occurred, the actual purpose of these pretextual traffic stops is not to enforce traffic laws or write tickets (also called "citations"). Rather, CPD officers use the alleged minor traffic violation as an excuse to question and harass the driver about whether they have guns or drugs in the car. Often officers ask to search the car—or conduct a search without consent—and/or frisk the driver, looking for guns or drugs. Sometimes officers handcuff drivers while they search them and their vehicle. Most of the stops are pretextual because their real purpose is investigatory—to find guns, drugs, or other contraband. In over 99% of all stops, CPD officers do not find guns, drugs, or other contraband, in which case they typically let the driver go, without explanation or apology.[3]

91. The above description from the *Wilkins* complaint is remarkably similar to what happened to Desmen on September 23, 2024. He was stopped for a minor parking infraction, his car was searched without his consent, the search revealed no guns, drugs or other contraband,[4] and Desmen was released without explanation or apology.

92. According to the ACLU's study of IDOT data, CPD's traffic stops have ballooned in the last decade, from around 85,000 in 2015 to more than 535,000 stops in 2023.

93. In 2023, CPD officers stopped Black drivers at a rate 3.75 times that of white drivers and stopped Latino drivers at a rate 2.73 times that of white drivers.

94. CPD's traffic stops yield almost no public safety benefits. Less than one-half of one percent of traffic stops in 2023 resulted in officers finding any contraband (such as weapons or drugs) after they searched a driver's vehicle.

---

[3] *Id.* at ¶ 3.
[4] Defendant Officers claim in the ISR that they recovered contraband, but the bottle of tequila they found in the trunk was not contraband. It was legally contained in the trunk, and Defendant Officers' claim that it was accessible to the driver is patently false and disproved by the fact that officers were forced to open the trunk itself to access the bottle.

95. In 2023, officers were more likely to find contraband in vehicles driven by white people, even though they were more likely to search cars driven by Black people.

96. The City is well aware of these numbers, which are reported annually by IDOT. Yet the number of traffic stops continues to increase year after year.

97. On information and belief, the traffic stops by Defendant Officers involve disproportionately Black and Latino motorists, consistent with the overall statistics for the Chicago Police Department.

98. Defendant Officers' actions as described above were committed because of, and in conjunction with, the City's policy and practice of committing pretextual traffic stops targeting Black and Latino drivers.

99. The City is not only deliberately indifferent to the unlawful nature of its discriminatory traffic stops, it is deliberately supporting, condoning, and encouraging this policy in a misplaced effort to deter crime.

### COUNT I – FEDERAL CLAIM
### UNLAWFUL DETENTION
### DEFENDANT OFFICERS

100. Each paragraph of this Complaint is incorporated as if restated fully herein.

101. Defendants Officers caused Desmen to be detained without reasonable suspicion or probable cause to believe he had committed any crime or offense, in violation of the Fourth Amendment to the U.S. Constitution.

102. Alternatively, Defendant Officers detained Desmen for an unnecessary and unreasonable amount of time under the circumstances.

12

103. As a proximate result of Defendants' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and emotional pain and suffering.

## COUNT II – FEDERAL CLAIM
## ILLEGAL SEARCH
## DEFENDANT OFFICERS

104. Each paragraph of this Complaint is incorporated as if restated fully herein.

105. Defendant Officers searched Desmen's car without a warrant, without legal process, without his consent, and without probable cause or reasonable suspicion to believe the car contained evidence of a crime, in violation of the Fourth Amendment to the U.S. Constitution.

106. As a proximate result of Defendants' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and emotional pain and suffering.

107. As a proximate result of Defendant Officers' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and emotional pain and suffering.

## COUNT III – FEDERAL CLAIM
## EXCESSIVE FORCE
## DEFENDANT OFFICERS

108. Each paragraph of this Complaint is incorporated as if restated fully herein.

109. The force used against Desmen by Defendant Officers, which included being yanked out of his car, being handcuffed, being forcibly detained, and being threatened by Defendant Officers, was objectively unreasonable and unnecessary based on the totality of the circumstances, and was undertaken intentionally with malice, willfulness, and reckless indifference to Desmen's constitutional rights.

110. As a proximate result of Defendant Officers' misconduct, Desmen suffered loss of liberty, physical pain, fear, mental anguish, humiliation and emotional pain and suffering.

## COUNT IV – STATE CLAIM
### FALSE ARREST/WRONGFUL IMPRISONMENT
### ALL DEFENDANTS

111. Each paragraph of this Complaint is incorporated as if restated fully herein.

112. Defendant Officers, and CITY OF CHICAGO, by and through its agents, Defendant Officers, restrained and/or arrested Desmen without having reasonable grounds to believe he had committed any crime or offense.

113. Alternatively, Defendant Officers, and CITY OF CHICAGO, by and through its agents, Defendant Officers, restrained and/or arrested Desmen for an unnecessary and unreasonable amount of time under the circumstances.

114. As a proximate result of Defendants' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and emotional pain and suffering.

## COUNT V – STATE CLAIM
### BATTERY
### ALL DEFENDANTS

115. Each paragraph of this Complaint is incorporated as if restated fully herein.

116. Defendant Officers, and CITY OF CHICAGO, by and through its agents, Defendant Officers, made contact with Desmen of an insulting or provoking nature without his consent or legal justification, thereby committing a battery.

117. As a proximate result of Defendants' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and physical and emotional pain and suffering.

## COUNT VI – STATE CLAIM
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### ALL DEFENDANTS

118. Each paragraph of this Complaint is incorporated as if restated fully herein.

14

119. Defendants' conduct, as described herein, was extreme and outrageous, defendants intended to cause or recklessly or consciously disregarded the probability of causing emotional distress, and Desmen suffered severe emotional distress as a proximate result of Defendants' actions.

120. As a proximate result of Defendants' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and physical and emotional pain and suffering.

## COUNT VII – FEDERAL CLAIM
## POLICY AND PRACTICE
## CITY OF CHICAGO

121. Each paragraph of this Complaint is incorporated as if restated fully herein.

122. As a matter of both policy and practice, the actions and inactions of defendant City of Chicago and the Chicago Police Department have facilitated and permitted the very type of misconduct at issue here by supporting, promoting, and encouraging the policy of mass traffic stops that disproportionately target Black and Latino drivers, as well as illegal searches.

123. Defendant City of Chicago and the Chicago Police Department failed to develop, maintain, and enforce proper procedures and conduct proper training of their employees, including but not limited to the Defendant Officers, and failed to control or discipline those employees on a continuing basis, said failures having proximately caused damages to Desmen.

124. Defendant City of Chicago and the Chicago Police Department had the duty to properly instruct, supervise, control, discipline or otherwise prevent or aid in preventing the commission of said wrongs, and could have done so by reasonable diligence, and knowingly, recklessly, or with deliberate indifference and callous disregard towards Desmen, refused and/or failed to do so.

125. As a proximate result of Defendant's misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and physical and emotional pain and suffering.

## COUNT VIII – STATE CLAIM
## INDEMNIFICATION
## DEFENDANT CITY OF CHICAGO

126. Each paragraph of this Complaint is incorporated as if restated fully herein.

127. At all relevant times, CITY OF CHICAGO was the employer of Defendant Officers.

128. Defendant Officers committed the acts alleged above under color of law and in the scope of their employment as employees of the CITY OF CHICAGO.

129. Illinois law provides that government entities are directed to pay any tort judgment for any damages for which employees are liable within the scope of their employment activities.

130. Should Defendant Officers be found liable on one or more of the claims set forth above, Plaintiff DESMEN NORTHINGTON demands, pursuant to Illinois law, that their employer, Defendant CITY OF CHICAGO, be found liable for any judgment plaintiff obtains against Defendant Officers, as well as attorney's fees and costs awarded, and for any additional relief this Court deems just and proper.

## PRAYER FOR RELIEF (ALL COUNTS)

For the foregoing reasons, the Plaintiff DESMEN NORTHINGTON prays for judgment against Defendants in a fair and reasonable amount, including compensatory and punitive damages, attorney fees and costs, and for any additional relief this Court deems just and proper.

## JURY DEMAND

The Plaintiff DESMEN NORTHINGTON requests a trial by jury.

Respectfully submitted,
DESMEN NORTHINGTON

/s/ Jordan Marsh
*Attorney for the Plaintiff*

**LAW OFFICE OF JORDAN MARSH LLC**
5 Revere Drive Suite 200
Northbrook, IL 60062
(224) 220-9000
jordan@jmarshlaw.com