**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DESMEN NORTHINGTON,

      Plaintiff,

            Case No. 24-cv-11466

      v.

Chicago Police Officers NICU TOHATAN,       *Jury Trial Demanded.*
MARIO FUENTES, JOSEPH VECCHIO,
ZACHARY CARMEN, CRYSTINA M.
KITTRELL, KENNETH A. SUNDE, and
CITY OF CHICAGO, a Municipal
Corporation,

      Defendants.

## FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, DESMEN NORTHINGTON, by and through his attorney, LAW OFFICE OF JORDAN MARSH LLC, complaining of the Defendants, Chicago Police Officers NICU TOHATAN, MARIO FUENTES, JOSEPH VECCHIO, ZACHARY CARMEN, CRYSTINA M. KITTRELL, KENNETH A. SUNDE, and CITY OF CHICAGO, and states the following:

### JURISDICTION AND VENUE

1. This action arises under the Constitution of the United States, particularly the Fourth and Fourteenth Amendments to the Constitution of the United States, under the laws of the United States, particularly the Civil Rights Act, Title 42 of the United States Code, §§ 1983 and 1988, and under the laws of the State of Illinois.

2.    The jurisdiction of this Court is invoked under the provisions of Title 28 of the United States Code, §§ 1331 and 1343. Plaintiff also invokes the supplemental jurisdiction of this Court pursuant to Title 28 of the United States Code, Section 1367.

3.    This Court has jurisdiction over this action pursuant to Title 28 of the United States Code §§ 1331 and 1367, as Plaintiff asserts claims under federal law and the state law claims arise out of the same facts as the federal claims. Venue is proper in the United States District Court for the Northern District of Illinois under Title 28 of the United States Code, § 1391(b)(2), as the events complained of occurred within this district.

## PARTIES

4.    At all times relevant herein, Plaintiff DESMEN NORTHINGTON (hereinafter "Desmen") was a resident of Chicago, Cook County, and resided in the Northern District of Illinois.  Desmen is Black.

5.    Defendants TOHATAN, FUENTES, VECCHIO, CARMEN, KITTRELL, and SUNDE ("Defendant Officers") are sued in their individual capacities and were at all times relevant, sworn tactical police officers employed by Defendant CITY OF CHICAGO, and were acting within the scope of their agency, service and/or employment with the CITY OF CHICAGO, and were acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Illinois.

6.    Defendant, CITY OF CHICAGO, is a government entity operating within the State of Illinois.  The CITY OF CHICAGO is responsible for the actions of its employees while acting within the scope of their employment.  At all times relevant to this action, CITY OF CHICAGO was the employer of Defendants TOHATAN, FUENTES, VECCHIO, CARMEN, KITTRELL, and SUNDE.

## FACTS

7.   This matter arises from an unlawful stop by Chicago police of an African-American motorist named Desmen Northington.

8.   The stop led to an unlawful detention in which Desmen was forcibly yanked out of the car, subjected to excessive force, handcuffed and detained for more than 10 minutes while being insulted, mocked and threatened by several officers.

9.   The unlawful stop was based on Desmen's alleged failure to have his hazard lights activated in a stopping zone, which should have resulted in nothing more than a parking ticket.

10.   Yet Desmen was subjected to a harrowing encounter with police, who intentionally escalated a minor parking infraction to an unlawful detention, continuously insulted and berated him, threatened to get him fired and to have his Concealed Carry License revoked, illegally searched his car, and then falsified a report to justify their conduct.

## THE INCIDENT

11.   On September 23, 2024, at approximately 7:06 p.m., Desmen was in his vehicle, which was stopped in a standing zone at or near 147 East Superior Street in Chicago, Illinois.

12.   Desmen had just returned to his car from a nearby store and was inputting his friend's address into the map/GPS function of his phone.

13.   Defendant officers drove past Desmen, saw that he was black, then pulled their squad car in front of Desmen's car.

14.   Defendant Officers approached Desmen, who lowered his window.

15.   Desmen had his phone in his right hand and was lowering his window with his left hand.

16.     Tohatan pointed his flashlight at Desmen and informed him he was supposed to have his flashers on.

17.     As Desmen began to speak, Tohatan cut him off and asked Desmen if he was the owner of the car.

18.     Desmen confirmed it was his car.

19.     Desmen informed Tohatan that he just got back from a nearby store and pointed to a bag in his passenger seat.

20.     Tohatan asked to see Desmen's license and insurance.

21.     When Desmen asked why he needed to show his license and insurance, Defendant Fuentes said, "You're being stopped by the police, so we're requesting your license and insurance – can you roll the windows down on your vehicle?"

22.     "For what – what's the issue?" asked Desmen.

23.     Tohatan said, "You're parked in a tow zone with no flashers. Can I see your license and insurance."

24.     Desmen reached into his front pocket and retrieved his driver's license and insurance card. While he was doing this, Tohatan said, "Lower the windows down, please."

25.     "There's no one else in the vehicle", said Desmen.

26.     Fuentes knocked on Desmen's rear window and said "[w]e gotta be able to see, roll down your windows."

27.     Desmen, who was still attempting to provide his license and insurance to Tohatan, said again, "[t]here's no one else in the vehicle".

28.     Fuentes said, "Come on out then."

29.  When Desmen objected and requested a sergeant, Fuentes opened the driver's door and said, "Come on out or we'll rip you out."

30.  When Desmen hesitated, Fuentes grabbed Desmen and began to jerk him out of the car.

31.  Desmen exited his car, and the officers grabbed him and turned him around and began to handcuff him behind his back.

32.  As Tohatan began to handcuff Desmen, and the officers held him against his car, Desmen said, "I'm not doing anything!"

33.  "Then listen!" yelled Fuentes furiously. "When we say get out you get out!"

34.  "I asked you for a license three times," said Tohatan. "You ask me why I'm asking for your license, are you stupid?"

35.  Once Desmen was handcuffed, Fuentes said, "You're going to jail."

36.  "He was moving his hands when I walked out of the car," said Tohatan to the other officers.

37.  Tohatan and other officers proceeded to search the interior of Desmen's car after Desmen was walked to the curb.

38.  When Desmen said he had the right to question why he was being asked to produce his license and insurance, Fuentes said, "No! You don't have the right! You have the right to go to jail!"

39.  Fuentes told Desmen his father should have raised him better.

40.  Tohatan began screaming at Desmen as he sat on the curb in handcuffs. "We're the police, when we're telling you 'Roll the windows down, you roll the windows down," he yelled.

"When asked for a license you give me a license you're not asking me this is not a stop," he continued. "It's a license insurance. Three times I ask you!"

41. Desmen corrected Tohatan: "No you didn't, you asked me twice and I said –"

42. Tohatan cut off Desman: "That's enough!" he yelled. "I don't have to ask you twice!"

43. Meanwhile the officers continued to illegally search Desmen's car.

44. Vecchio removed a bottle of tequila from Desmen's trunk – where it was legally stored – and emptied it out on the street.

45. "Guess you're gonna learn to listen today, man", said Vecchio as he unzipped a duffel in Desmen's trunk and dumped its contents out.

46. When Desmen requested a sergeant to be called to the scene, Vecchio refused, saying sarcastically, "Yeah, I'm going to start listening to everything that you want me to do."

47. Fuentes chimed in: "Yeah, right. You don't want to listen to us but we gotta listen to you?"

48. "When we say roll down the windows, you roll 'em down – you don't question us", said Fuentes.

49. The search revealed no contraband or other evidence of criminal conduct.

50. Vecchio approached Desmen, who was still sitting on the curb in handcuffs, and said, "Wait, man, you got your CDL [Commercial Driver's License]? And you got all the liquor? You drive for a living and you're gonna act like this with all the liquor?"

51. When Desmen tried to answer, Vecchio cut him off: "Really – how 'bout you lose your job today?"

52. "Are you sorry?" Vecchio asked Desmen.

53. When Desmen said "No" and tried to explain that he was just trying to put his friend's address into his GPS, Vecchio slammed Desmen's trunk shut and said, "Wrong answer."

54. "You're a punk", Vecchio said.

55. Desmen said, "I'm what?"

56. "A punk", said Vecchio.

57. "And you've got a CCL [Concealed Carry License]?" Vecchio asked Desmen incredulously.

58. When Desmen answered that he did have a CCL, Vecchio said, "I think we're gonna revoke that after this. For this behavior. That's bad behavior. Scary behavior."

59. "You're a clear and present danger," said Fuentes.

60. "This is bad behavior", said Vecchio – again. "Really bad."

61. Fuentes falsely claimed Desmen's license plates were expired.

62. As Desmen protested, Fuentes said, "Dude, we do this about 100 times a night. You think you're the only one?"

63. As the officers continued to lecture and berate Desmen, Vecchio said, "You started all the problems. You started it all."

64. Later, as Desmen tried to explain why he was so stunned by the officers' conduct, Vecchio laughed, and said, "You're so dramatic and theatrical, man."

65. Defendant officers claimed Desmen had "liquor all over", speculated aloud that Desmen was intoxicated, and later claimed that one of the officers "smelled a strong odor of alcoholic beverage emanating from the vehicle".

66. Despite this, Defendant Officers never gave Desmen a breathalyzer or conducted any sobriety tests.

67. Vecchio released Desmen from his handcuffs.

68. Before he finished removing the handcuffs, Vecchio asked Desmen – again – if he was sorry.

69. Defendants CARMEN, KITTRELL, and SUNDE arrived moments after the incident began, and observed the conduct of Defendants Vecchio, Fuentes and Tohatan for approximately eight minutes without intervening to prevent further violation of Desmen's constitutional rights.

70. Defendant Kittrell took part in lecturing Desmen about "listening to the police" while the events described herein occurred.

71. Vecchio released Desmen from his handcuffs.

72. Before he finished removing the handcuffs, Vecchio asked Desmen – again – if he was sorry.

73. As Vecchio released Desmen, Defendant Carmen or Sunde was unable to suppress a smirk.

74. Defendant Carmen or Sunde shook his head and smiled before turning away.

75. Fuentes acted as if he was upset that Vecchio was releasing Desmen. "I would take him to jail. I'm gonna walk away", he said sarcastically. "I feel so absurd after this."

76. After all of the yelling, and the false accusations that Desmen was intoxicated, that there was liquor all over his car, that he was "a clear and present danger", that Desmen should lose his job and have his licenses revoked, the officers released Desmen without conducting a sobriety test, without charging him with a crime, and without writing him a parking ticket.

77.   Ultimately, it took five or six tactical police officers and two squad cars more than 10 minutes to handle an alleged parking infraction that did not even result in a ticket.

## THE FALSE REPORT

78.   One or more of the Defendant Officers completed an Investigatory Stop Report ("ISR") that was riddled with falsehoods.

79.   Defendants claimed in the ISR that they pulled up in front of Desmen's stopped car (as opposed to behind the car) "in an attempt not to block traffic on the one way street".

80.   This rationale was obviously false, for several reasons:

   a.   There were several car lengths of space immediately behind Desmen's car where the officers could have parked or stopped without obstructing traffic.

   b.   When the officers pulled in front of Desmen's car, they parked at an angle with the rear of their SUV sticking out into a moving traffic lane.

   c.   After the initial approach by Defendant Officers, another police SUV parked behind Desmen's car in a moving lane, completely blocking the lane.

   d.   Officers are trained to pull up and approach vehicles from behind for officer safety.

81.   Defendant Officers' statement that they pulled up in front of Desmen to avoid blocking traffic was an obvious pretext for the real reason: so they could see if Desmen was black before they decided whether to approach and detain him.

82.   Defendant Officers claimed in the ISR that they observed Desmen "reaching towards the back seat area and making furtive movements downwards."

83.   This was false. Desmen never reached towards the back seat or made furtive movements downwards.  He was clearly sitting up in his seat, holding his phone with his right hand and lowering the window with his left hand as the officers approached.

84. Defendant Officers falsely claimed in the ISR that Desmen refused to produce his driver's license and insurance.

85. In fact, Desmen was complying with the request for his license and insurance – pulling them out of his pocket and preparing to hand them to Tohatan – when Tohotan ordered him to lower his windows at the same time.

86. Defendant Officers claimed in the ISR that they "assisted" Desmen out of his car "in an attempt to avoid an escalation", when in fact Fuentes forcefully yanked him from the driver's seat and needlessly escalated the situation.

87. Defendant Officers claimed in the ISR that they found a bottle of tequila in "the immediate reachable area of the vehicle."

88. This too is false. The bottle of tequila was in the trunk of the car. The officers could not reach the bottle from the back seat, even after they pulled one of the seats down. Instead, they had to open the trunk itself to get to the bottle.

89. Defendant Officers stated in the ISR that "several police officers explained to the driver on scene that his behavioral [sic] will not be tolerated on the public way."

90. This was true to a point. Defendant Officers spent much of the detention mocking and lecturing Desmen about listening to and complying with the police and not asking questions.

91. After Defendant Officers released Desmen and left the scene, his car was a mess. Tylenol pills were scattered throughout the front seat area, mail had been opened, and bags had been dumped out.

92. After Defendant Officers left the scene, Desmen called 911 to issue a formal complaint against them.

93. A sergeant – Sgt. Eric Seng – came to the scene within minutes.

94. After Desmen told Seng what had happened, Seng said that the officers involved were his officers and tried to explain the officers' behavior by telling Desmen, "Just the way that downtown's been, we have more aggressive officers down here."

95. Sgt. Seng told Desmen that he would watch the bodycameras of his officers and that he may end up suspending one or more of the officers for a day or two, telling Desmen, "that's a big chunk of change" out of their pocket. "That's probably what you're looking at as far as punishment as far as the officers", he told Desmen.

96. Seng told Desmen that he would call Desmen after he viewed the bodycamera footage and would let him know how he planned to handle the discipline, and that if chose to do so, Desmen could contact the Civilian Office of Police Accountability ((COPA) if he still wanted to do more.

97. The following day, Seng called Desmen and said that he was embarrassed by the officers' behavior. He told Desmen he planned to suspend Vecchio for one day and issue written reprimands to the other two officers.

98. When Desmen informed Seng that he still intended to pursue the matter, Seng's tone changed, and he told Desmen if he was looking for a "cash cow", he would probably not be successful.

99. On information and belief, Seng never pursued any disciplinary conduct of Defendant Officers after he reviewed the bodycamera footage.

### CPD'S LONGSTANDING PATTERN AND PRACTICE OF RACIALLY DISCRIMINATORY TRAFFIC AND INVESTIGATORY STOPS

100. Chicago police have a longstanding practice of disproportionately targeting Black and Hispanic drivers for traffic and pedestrian stops.

101.    Defendant Officers stopped Desmen pursuant to a de facto policy and practice within the Chicago Police Department of disproportionately targeting Black drivers in baseless, pretextual stops as a means to search them and their vehicles, in the hopes of finding contraband or other basis to arrest and criminally charge the Black drivers or occupants of the vehicle. This includes pulling over moving vehicles, approaching stopped or parked vehicles, and stopping pedestrians.

### DOJ Report

102.    In 2015, the United States Department of Justice (hereinafter "DOJ") Civil Rights Division and Special Litigation Section, as well as the United States Attorney's Office for the Northern District of Illinois, initiated an investigation of the Chicago Police Department and the then-existing Independent Police Review Authority (hereinafter "IPRA").

103.    The DOJ report was released on January 13, 2017.

104.    According to the January 13, 2017, DOJ report, Black Chicagoans have been disproportionately targeted for decades by the Chicago police department and have been subjected to disproportionately higher rates of stops, searches, arrests, charges, and uses of force than white Chicagoans.

105.    The DOJ found that CPD did not adequately train or supervise its officers, noting that "CPD does not provide officers or supervisors with adequate training and does not encourage or facilitate adequate supervision of officers in the field. These shortcomings in training and supervision result in officers who are unprepared to police lawfully and effectively; supervisors who do not mentor or support constitutional policing by officers; and a systemic inability to proactively identify areas for improvement, including Department-wide training needs and interventions for officers engaging in misconduct."

### State of Illinois Lawsuit and the 2019 Consent Decree

106.    In August 2017, the State of Illinois sued the City of Chicago, seeking to "ensure the City enacts comprehensive, lasting reform of the Chicago Police Department ("CPD"), the Independent Police Review Authority ("IPRA"), and the Chicago Police Board ("Police Board"). State of Illinois v. City of Chicago, Case No. 17-cv-6260, (Northern District of Illinois, August 29, 2017), Dkt. 1.

107.    In its lawsuit, the State noted that "[f]or nearly 50 years, reviews of CPD's policing practices have identified significant failures by CPD officers to act lawfully." Id. at ¶ 3.

108.    The State alleged that the City was deliberately indifferent to the repeated pattern of CPD's use of excessive force and racially discriminatory policing practices, and that External complaints, threatened and actual lawsuits, and government commissioned reports, along with the media's frequent coverage of CPD's repeated use of excessive force and racially discriminatory police action, have put the City on notice of CPD's unconstitutional conduct

109.    As a result of the State's lawsuit, the City entered into a Consent Decree, in which the City agreed to institute many reforms to bring CPD's conduct into compliance with the U.S. and Illinois constitutions and other applicable laws.  (Dkt. 703-1.)

110.    The Consent Decree, which became effective March 1, 2019, was established "to ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety."

111.    The Decree further sought to "ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely." The Decree required changes in the areas of community policing; impartial policing; crisis intervention; use of force; recruitment, hiring, and promotions; training; supervision; officer wellness and support; accountability and transparency; and data collection, analysis, and management. (Consent Decree, Dkt. 703-1, at 8.)

112.    U.S. District Judge Robert M. Dow appointed Independent Monitor Margaret M. Hickey, who leads an Independent Monitoring Team ("IMT") which would monitor and evaluate the City's compliance with the Consent Decree, and issue quarterly progress reports.  (Id., Dkt. 713.)

113.    The City agreed to attempt to meet all of the requirements of the Consent Decree within five years of its effective date. (Consent Decree, ¶ 714.)

114.    On March 25, 2022, the Consent Decree was extended an additional three years because of "missed deadlines and lagging compliance".  (Dkt. 1011.)

115.    In June 2023, the IMT reported that the City had only achieved 82 percent preliminary compliance with the provisions of the Consent Decree and had only achieved full compliance of six percent of the Decree's provisions. (Dkt. 1097 at 4.)

116.    Sharon Fairley, a University of Chicago Law School professor who previously served as chief administrator of the Independent Police Review Authority, told WTTW News, "Clearly, from the monitor's semi-annual reports, the department is not as far along with compliance as they could or should be at this point."[1]

---

[1] Guthmann, Andrea, *Examining the Chicago Police Department's Progress on the Consent Decree Almost 5 Years Into the Process*, WTTW News, accessible at http://tiny.cc/c0y8001.

117.    The Illinois deputy attorney general charged with overseeing the consent decree said that the city and CPD had "resisted commonsense" proposals to fix major problems.[2]

118.    On June 14, 2023, the City's former Inspector General, Joe Ferguson, filed a public comment in the Consent Decree litigation.  Ferguson expressed frustration with the City's halting progress of compliance with the consent decree and called for a "hard reset" and a "fresh start" for oversight of the decree, "because Consent Decree implementation and monitoring is a faltering undertaking both in substantive accomplishment and in transparency. In the absence of a hard methodological and operational reset, I believe the Consent Decree is at high risk of failing to achieve its objectives." (Dkt. 1092 at 1.)

119.    The City's failure to comply with the Consent Decree continues to this day and is embodied in the types of incidents described herein.

120.    According to the CPD Consent Decree Independent Monitoring Report 9, "the City and the CPD continued to struggle to make progress toward compliance" with impartial policing requirements in the Consent Decree.[3]

121.    As of December 31, 2023, the City and CPD had achieved preliminary compliance with eight provisions of the consent decree regarding impartial policing, secondary compliance with 12 provisions, and no compliance with nine provisions.

122.    The City and CPD had not made full compliance with any of the impartial policing provisions of the Consent Decree.

---

[2] *Is the Chicago Consent Decree Working? Consent Decrees for Police Reform: The Chicago Experience*, Charles Fain Lehman, Manhattan Institute, July 20, 2023, accessible at https://tinyurl.com/4hst87he.
[3] Chicago Police Department Consent Decree, Independent Monitoring Report 9, July 1, 2023 – December 31, 2023, p. 24, available at https://tinyurl.com/3u67ja6s.

123.    In the 10th Independent Monitoring Report, issued on November 19, 2024, the IMT reported that "the City's and the CPD's progress toward compliance with these important [impartial policing] requirements remained largely unchanged from the previous reporting period."[4]

124.    The IMT noted that "the City and the CPD have not reached any level of compliance with five paragraphs in the Impartial Policing section, which is concerning".[5]

### OIG Report

125.    According to a March 1, 2022, Office of Inspector General ("OIG") Report on Race and Ethnicity-Based Disparities in Chicago Police Department's Use of Force, "quantitative evidence from investigatory stop and traffic stop data shows an overwhelming disparity in the rates at which Black and non-Black people were stopped by the police. The overrepresentation of Black people among those stopped by the police was consistent across traffic stops and investigatory stops, and it was persistent across every CPD District, notwithstanding differences in District crime rates and the demographic composition of District populations."[6]

126.    According to the data collected on investigatory stops, "Black people were subjected to a search of their person 1.5 times more frequently than non-Black people, and also subjected to a pat-down 1.5 times more frequently than non-Black people."[7]

---

[4] Chicago Police Department Consent Decree, Independent Monitoring Report 10, January 1, 2024 - June 30, 2024, p. 24, available at https://tinyurl.com/64fmhxun.
[5] Id. at p. 26.
[6] *Ethnicity-Based Disparities in Chicago Police Department's Use of Force,* City of Chicago Office of Inspector General, (March 1, 2022), pp. 31-32, available at https://igchicago.orglwp-contentluploads/2022/02/Use-of.Force-Disparities-Report.pdf.
[7] Id.

127.    Moreover, "Black people were also subjected to a vehicle search more often than non-Black people. Black motorists' vehicles were searched in 0.95% of traffic stops, which made searches of Black motorists' vehicles 3.3 times more frequent than searches of White motorists' vehicles (0.29% of traffic stops of White motorists) and 1.6 times more frequent than searches of all non-Black motorists' vehicles (0.60% of traffic stops of all non-Black motorists)."[8]

128.    A September 2022 OIG report identified "shortcomings related to the collection and management of litigation data involving CPD. These shortcomings limit the City's ability to understand areas of litigation risk to the City and to implement responsive improvements to CPD's operations and policies."[9]

129.    In an interview regarding the 2022 Report, Inspector General Deborah Witzburg acknowledged that the city was failing to improve CPD policy and practices stating,

> [w]e are paying out a lot of dollars without giving ourselves the opportunity to learn any lessons as a result. The city is not collecting the sort of information which would allow practices and policies to be improved[.] We should be learning lessons from settlements and judgments being paid out. Those are taxpayer dollars being paid out, either because there has been a finding that something went wrong or the city has made a determination to settle a claim that something went wrong. We are missing very expensive opportunities if we are not informing ourselves and improving practices and policies as a result of those settlements and judgments.[10]

130.    Underscoring Ms. Witzburg's comments, the City of Chicago recently approved (pending City Council authority) a $1.25 million settlement of a lawsuit stemming from the

---

[8] Id.

[9] *Use of Litigation Data in Risk Management Strategies for CPD,* City of Chicago Office of Inspector General, (September 29, 2022), available at https://tinyurl.com/yc5hd6n5.

[10] *Taxpayers shell out $250M in police-related settlements; new report slams city efforts to learn from those mistakes*, Fran Spielman, Chicago Sun Times, Sept 29, 2022, available at https://tinyurl.com/32da24yd.

pretextual stop and subsequent shooting death of Dexter Reed in March 2024, which also resulted in the shooting injury of a police officer.

131.    Twenty-ninth ward Alderman Chris Taliaferro, Chair of the City Council's Police Committee, told the Chicago Sun-Times he believed the shooting was justified, but said that the seven-figure settlement was not unexpected "if the law department has concluded Reed should not have been stopped in the first place."[11]

132.    The Sun-Times article notes that "[a] monitor of the 5-year-old federal consent decree that calls for reforms in the police department recommended traffic stops be added to the list of police activities that should be reexamined, but that has yet to happen."[12]

133.    The City's indifference to its failure to achieve any significant progress in satisfying the requirements of the Consent Decree – and its corollary failure to reform itself in any meaningful way – are illustrated, in part, by the statements of those who were directly involved in the attempts to reform CPD.

134.    In 2021, Chad Williams, the former civilian commanding officer of CPD's audit division, resigned after emailing Mayor Lori Lightfoot to say that "my disappointment with the inability of this department's top leadership to even feign interest in pursuing reform in a meaningful manner has made it impossible for me to remain involved."[13]

135.    In August 2022, the City unceremoniously fired Robert Boik, CPD's executive director of constitutional policing and reform.  Arne Duncan, former U.S. Secretary of Education and

---

[11] *Fatal police shooting of Dexter Reed leads to $1.25M settlement that includes reining in traffic stops,* Fran Spielman and Frank Main, Chicago Sun-Times, Feb. 3, 2025, accessible at https://tinyurl.com/v36xz3sh.
[12] Id.
[13] *Chicago police director of reform fired following email to Superintendent David Brown over staff changes, sources say,* Chicago Tribune, https://tinyurl.com/yyn2e4a5.

founder of violence prevention organization Chicago CRED, wrote in a statement that "Bob Boik was fired for blowing the whistle and telling the truth — that he has no support and that the administration is not serious about police reform."[14]

136.    These facts evidence not only a deliberate indifference to the problems that resulted in the Consent Decree, but they also suggest an outright refusal to take any concrete steps toward reform, and an institutional hostility toward the idea of police reform.

137.    They also explain the City's remarkable failure – year after year – to achieve significant compliance with the provisions of the Consent Decree.

138.    The continued failure – as late as November 2024 – to make any significant progress on satisfying the requirements of the Consent Decree (as demonstrated by the foregoing findings of the IMT) is proof that the City's indifference remains to this date.

***Wilkins* Lawsuit**

139.    In a class action lawsuit filed against the City of Chicago last year by the American Civil Liberties Union, plaintiffs claim that traffic stops in Chicago skyrocketed after 2016 while stops throughout the rest of the state remained stable.[15]

140.    The *Wilkins* lawsuit is based in large part on data from the City's Office of Emergency Management and Communications (OEMC), and the Illinois Department of Transportation (IDOT).

141.    The *Wilkins* plaintiffs allege that "[s]ince 2016, CPD officers have targeted Black and Latino drivers with extremely high volumes of traffic stops, frisks, and searches, not for the purpose of enforcing traffic laws but to investigate, harass, and intimidate community members

---

[14] Id.
[15] *Wilkins v. City of Chicago,* 23-cv-4072, Dkt. 87, ¶ 498.

(also called "pretextual" stops) on the basis of race and national origin (the "mass traffic stop program")."[16]

142.   The *Wilkins* plaintiffs allege further that CPD's pretextual traffic stops follow a typical pattern:

> CPD officers pull over a Black or Latino driver for an alleged minor traffic infraction… Regardless of whether the alleged infraction occurred, the actual purpose of these pretextual traffic stops is not to enforce traffic laws or write tickets (also called "citations"). Rather, CPD officers use the alleged minor traffic violation as an excuse to question and harass the driver about whether they have guns or drugs in the car. Often officers ask to search the car—or conduct a search without consent—and/or frisk the driver, looking for guns or drugs. Sometimes officers handcuff drivers while they search them and their vehicle. Most of the stops are pretextual because their real purpose is investigatory—to find guns, drugs, or other contraband. In over 99% of all stops, CPD officers do not find guns, drugs, or other contraband, in which case they typically let the driver go, without explanation or apology.[17]

143.   The above description from the *Wilkins* complaint is remarkably similar to what happened to Desmen on September 23, 2024. He was stopped for a minor parking infraction, his car was searched without his consent, the search revealed no guns, drugs or other contraband,[18] and Desmen was released without explanation or apology.

144.   While most of the stops of the lead plaintiffs in Wilkins began with officers pulling over a moving vehicle, rather than officers approaching a stopped car, as they did in Desmen's case, there is no material difference between officer misconduct committed after they pull over a vehicle and officer misconduct committed after they approach a stopped vehicle. The indignity is the same. The misconduct is the same.

---

[16] *Id.* at ¶ 2.

[17] *Id.* at ¶ 3.

[18] Defendant Officers claim in the ISR that they recovered contraband, but the bottle of tequila they found in the trunk was not contraband. It was legally contained in the trunk, and Defendant Officers' claim that it was accessible to the driver is patently false and disproved by the fact that officers were forced to open the trunk itself to access the bottle.

145.    According to the ACLU's study of IDOT data, CPD's traffic stops have ballooned in the last decade, from around 85,000 in 2015 to more than 535,000 stops in 2023.

146.    In 2023, CPD officers stopped Black drivers at a rate 3.75 times that of white drivers and stopped Latino drivers at a rate 2.73 times that of white drivers.

147.    CPD's traffic stops yield almost no public safety benefits. Less than one-half of one percent of traffic stops in 2023 resulted in officers finding any contraband (such as weapons or drugs) after they searched a driver's vehicle.

148.    In 2023, officers were more likely to find contraband in vehicles driven by white people, even though they were more likely to search cars driven by Black people.

### Racial Disparities in CPD Investigative Stops

149.    In 2023, approximately 35 percent of Chicagoans were white, 29 percent were Black, and 29 percent were Hispanic.

150.    Yet according to a study by the Illinois Department of Transportation – based on data submitted by the City of Chicago – 66 percent of pedestrians stopped by Chicago police officers in 2023 were Black, and 7.3 percent were white.

151.    The numbers are even more stark in the 18th District, where the incident in question occurred: While white residents make up 73 percent of the 18th district, they are only 11 percent of the pedestrians stopped by Chicago police officers in 2023. Seventy-two percent of pedestrians stopped in the 18th district were Black, despite the fact that Black people make up only 6.7 percent of the district's residents.[19]

152.    The numbers are similar when applied to the Defendant Officers in this case.

---

[19] On information and belief, pedestrian stop data includes all ISRs, which include officers approaching a stopped vehicle.

153.    According to ISR data from the Chicago Police Department, Defendant Fuentes was either the first officer or the second officer on 409 ISR stops between 2022 and 2024.

154.    Of those 409 stops, nearly 80 percent involved Black civilians, and only 6 percent involved white civilians.

155.    For the same period of time, Defendant Tohatan was involved as the first or second officer on 298 ISR stops.

156.     Of those 298 ISR stops, 254 – or 85 percent – involved Black civilians.

157.    For the same period of time, Defendant Vecchio was involved as the first or second officer on 280 ISR stops.

158.    Of those 280 ISR stops, 264 – nearly 95 percent – involved Black civilians.

159.    These stops occurred in a district that is 73 percent white and only 6.7 percent Black.

160.    But the number of stops is likely far greater than we know.  In August 2024, Injustice Watch, along with a non-profit organization called Bolts, determined that "Chicago Police officers have secretly pulled over as many as 20,000 more drivers per month in the past year than they have reported publicly, in violation of a 2003 law requiring them to document every traffic stop".[20]

161.    The investigation revealed, among other things, that "police department officials know the traffic stop data they report to state regulators are an undercount."[21]

### Prior Lawsuits Against Defendant Officers

162.    Defendant officers are no strangers to being accused of unlawful conduct similar to the conduct described in this complaint.

---

[20] Sabino, Pascal, *Chicago police made nearly 200,000 secret traffic stops last year*, Injustice Watch. Available at https://tinyurl.com/yjudkw7k.
[21] Id.

163.     In *Haley v. Tohatan, et al.* (22-cv-1785), Defendant Tohatan was accused of unlawful search and seizure after he and Sgt. Edward Ranzzoni approached a stopped vehicle on West Erie Street on December 8, 2021, just four blocks from where the instant stop occurred.

164.     The plaintiff in *Haley* alleged that Tohatan ordered him out of his car, handcuffed him, and searched his car despite there being no probable cause or reasonable suspicion of any criminal conduct.

165.     The City settled *Haley* for $38,000.

166.     In *Partee v. Hasan* (2019-cv-3689), Defendant Tohatan and two other officers were accused of handcuffing the plaintiff and searching his car despite the fact that the plaintiff had done nothing illegal.

167.     The City settled *Parte*e for $40,000.

168.     In *Farris v. City of Chicago et al.* (22-cv-1729), Defendants Tohatan and Fuentes were accused of excessive force, unlawful search, wrongful detention, and malicious prosecution after they approached a stopped vehicle.

169.     The City settled *Farri*s for $100,000.

170.     In *Wilson v. Vecchio* (24 cv 12371), Defendant Vecchio is accused of approaching the plaintiff's stopped car for a minor parking violation, unlawfully searching the plaintiff's vehicle, unlawfully detaining the plaintiff, using excessive force against the plaintiff, and denying the plaintiff equal protection.

171.     In *Wilson,* Sgt. Seng is also accused of excessive force and denial of equal protection, and Seng is accused of failing to intervene in Vecchio's alleged unlawful conduct.

172.     *Wilson* remains pending.

173.   In *Ipaye v. City of Chicago et al.* (24-cv-8958), Defendant Tohatan is accused of approaching the plaintiff as he was putting air into the tires of a car and unlawfully seizing the plaintiff and searching his bag.  Defendant Vecchio is accused of searching the plaintiff's vehicle and person without consent or probable cause.

174.   *Ipaye* remains pending.

175.   The cases cited above are just the tip of the iceberg when it comes to lawsuits against Chicago police for unlawful stops and searches.

176.   The City has paid out millions of dollars in settlements of lawsuits alleging unlawful traffic and investigatory stops and illegal searches.

177.   As just one example, the City's Law Department recently agreed to pay the family of Dexter Reed $1.25 million to settle their lawsuit arising from an illegal, pretextual stop of Reed by Chicago police which resulted in the death of Reed and the wounding of an officer.

**Defendant Fuentes' Disciplinary History**

178.   Defendant Officers have been disciplined for similar conduct in the past.

179.   On May 30, 2023, COPA sustained allegations against Defendant Fuentes and Sgt. Edward Ranzzoni of using profanity against a civilian at a traffic stop, unlawfully detaining the civilian, and unlawfully impounding the civilian's vehicle.

180.   During the incident, Fuentes ordered the driver out of the car and handcuffed him, telling him his car would be towed. Fuentes yelled at the man, "Your $50,000 car is my car now! No no, it's my car now! It's my car now! My car now! My car!"

181.   Fuentes later claimed he searched the car because he smelled burnt cannabis. But the search yielded no narcotics or other contraband.

182. The officers issued the civilian a citation for parking in a tow zone, and ordered his car towed under a provision of the City of Chicago ordinances that authorized towing "[w]hen an unattended vehicle is parked illegally" in a marked tow zone.

183. The civilian was found "not liable" by the administrative law judge on his citation – presumably because his car was not unattended.

184. COPA recommended that Fuentes receive a 45-day suspension for his conduct.

185. COPA also recommended a 60-day suspension for Sgt. Ranzzoni, who, COPA noted, "allowed Officer Fuentes to behave as if he felt he was entirely in charge rather than the sergeant. At one point, Officer Fuentes even seemed to give an order to his supervisor by saying, 'Sarge, tell him to get out of the car', to which instruction Sgt. Ranzzoni immediately complied."

186. The Chicago Police Department concurred with COPA's findings but felt each officer should receive only a 10-day suspension.

187. On January 16, 2024, COPA sustained allegations that Defendant Fuentes "made insulting, mocking and belittling statements" toward two civilians at a traffic stop, and that he arrested a civilian and impounded his vehicle as retaliation for the civilian looking at Fuentes' identification.

188. At several points during the stop, Fuentes told the civilians that they were "ignorant as fuck" and commented to a fellow officer that one of the civilians was a "jag", which Fuentes later admitted was shorthand for "jagoff".

189. When Fuentes observed the civilian looking at his star number and squad car, Fuentes said, "You are not going to size me up like that, looking at my star number and my vehicle number".

190.    The COPA investigator noted in his report that "[d]espite Fuentes claiming in his interview that he felt [one of the civilians] was disrespectful and did not respect their authority, only Fuentes is captured acting in a disrespectful manner."

191.    COPA recommended a 10-day suspension for Fuentes as a result of his conduct.

192.    On January 23, 2024, COPA sustained allegations that Defendant Fuentes and another officer used profanity and racist language toward African-American civilians during a traffic stop.

193.    During the traffic stop, Fuentes told another officer, "I'm tired of these fucking people acting like animals, dude", and referred to the civilians as "fucking animals".

194.    Fuentes' conduct was captured on body-worn camera footage.

195.    COPA recommended a suspension of up to 30 days for Fuentes.

196.    On April 5, 2024, the Chicago Police Department concurred with COPA's findings and its recommended penalty of a 30-day suspension for Defendant Fuentes.

**Defendant Tohatan's Disciplinary History**

197.    On November 27, 2018, COPA sustained allegations that Defendant Tohatan engaged in an unjustified verbal altercation with a civilian, illegally searched the civilian's car, and improperly issued a citation to the civilian for no proof of insurance despite the civilian offering to show him proof of insurance on his phone.

198.    The incident began when Tohatan and another officer pulled the civilian over after doing a U-turn.

199.    COPA recommended a 7-day suspension for Defendant Tohatan.

200.    On August 25, 2020, COPA sustained an allegation that Defendant Tohatan engaged in verbal abuse.

201.   Tohatan was suspended for 5 days as a result of his misconduct.

202.   On December 20, 2022, COPA sustained allegations that Defendant Tohatan engaged in verbal abuse and profanity.

203.   Defendant Tohatan was suspended for 5 days as a result of his misconduct.

204.   On April 11, 2023, COPA sustained allegations that Defendant Tohatan engaged in an undisclosed civil rights violation.

205.   Tohatan was reprimanded for his misconduct.

206.   On December 14, 2023, COPA sustained allegations that Defendant Tohatan engaged in undisclosed misconduct during a traffic stop.

207.   On an unknown date, COPA sustained allegations against Defendant Tohatan of Coercion Threat of Arrest/Charges Coerced Confession.

208.   The discipline cited above is just the tip of the iceberg when it comes to discipline against Chicago police officer for unlawful stops and searches and verbal abuse of civilians.

## COUNT I – FEDERAL CLAIM
## UNLAWFUL DETENTION
## DEFENDANT OFFICERS

209.   Each paragraph of this Complaint is incorporated as if restated fully herein.

210.   Defendants Officers caused Desmen to be detained without reasonable suspicion or probable cause to believe he had committed any crime or offense, in violation of the Fourth Amendment to the U.S. Constitution.

211.   Alternatively, Defendant Officers detained Desmen for an unnecessary and unreasonable amount of time under the circumstances.

212.     As a proximate result of Defendants' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and emotional pain and suffering.

## COUNT II – FEDERAL CLAIM
### ILLEGAL SEARCH
### DEFENDANT OFFICERS

213.     Each paragraph of this Complaint is incorporated as if restated fully herein.

214.     Defendant Officers searched Desmen's car without a warrant, without legal process, without his consent, and without probable cause or reasonable suspicion to believe the car contained evidence of a crime, in violation of the Fourth Amendment to the U.S. Constitution.

215.     As a proximate result of Defendants' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and emotional pain and suffering.

216.     As a proximate result of Defendant Officers' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and emotional pain and suffering.

## COUNT III – FEDERAL CLAIM
### EXCESSIVE FORCE
### DEFENDANT OFFICERS

217.     Each paragraph of this Complaint is incorporated as if restated fully herein.

218.     The force used against Desmen by Defendant Officers, which included being yanked out of his car, having his arm pulled up behind his back, being handcuffed, being forcibly detained, and being threatened by Defendant Officers, was objectively unreasonable and unnecessary based on the totality of the circumstances, and was undertaken intentionally with malice, willfulness, and reckless indifference to Desmen's constitutional rights.

219.     As a proximate result of Defendant Officers' misconduct, Desmen suffered loss of liberty, physical pain, fear, mental anguish, humiliation and emotional pain and suffering.

## COUNT IV
## DENIAL OF EQUAL PROTECTION
### DEFENDANT OFFICERS

220.    Each paragraph of this Complaint is incorporated as if restated fully herein.

221.    As described more fully above, Defendant Officers denied Desmen equal protection of the law in violation of his constitutional rights.

222.    Defendant-Officers targeted Desmen not because they had any lawful or legitimate basis to approach him, detain him, or search his property, but because he was Black.

223.    The misconduct described in this count was motivated by racial animus and constituted purposeful discrimination.

224.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

225.    The misconduct described above had a discriminatory effect and was motivated by a discriminatory purpose.

226.    As a proximate result of Defendant Officers' misconduct, Desmen suffered loss of liberty, physical pain, fear, mental anguish, humiliation and emotional pain and suffering.

## COUNT V – FEDERAL CLAIM
## FAILURE TO INTERVENE
### DEFENDANTS CARMEN, KITTRELL, and SUNDE

227.    Each paragraph of this Complaint is incorporated as if restated fully herein.

228.    Defendants CARMEN, KITTRELL, and SUNDE knew that officers Tohatan, Fuentes and Vecchio were violating Desmen's constitutional rights and had a reasonable opportunity to intervene to prevent or mitigate Tohatan, Fuentes and Vecchio's unlawful conduct, but failed and/or refused to do so.

229.    As a direct and proximate result of Defendants' failure to intervene, Desmen suffered loss of liberty, physical pain, fear, mental anguish, humiliation and emotional pain and suffering.

## COUNT VI – STATE CLAIM
### FALSE ARREST/WRONGFUL IMPRISONMENT
### DEFENDANTS TOHATAN, FUENTES, VECCHIO, AND CITY OF CHICAGO

230.    Each paragraph of this Complaint is incorporated as if restated fully herein.

231.    Defendant Officers, and CITY OF CHICAGO, by and through its agents, Defendant Officers, restrained and/or arrested Desmen without having reasonable grounds to believe he had committed any crime or offense.

232.    Alternatively, Defendant Officers, and CITY OF CHICAGO, by and through its agents, Defendant Officers, restrained and/or arrested Desmen for an unnecessary and unreasonable amount of time under the circumstances.

233.    As a proximate result of Defendants' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and emotional pain and suffering.

## COUNT VII – STATE CLAIM
### BATTERY
### DEFENDANTS TOHATAN, FUENTES, VECCHIO, AND CITY OF CHICAGO

234.    Each paragraph of this Complaint is incorporated as if restated fully herein.

235.    Defendant Officers, and CITY OF CHICAGO, by and through its agents, Defendant Officers, made contact with Desmen of an insulting or provoking nature without his consent or legal justification, thereby committing a battery.

236.    As a proximate result of Defendants' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and physical and emotional pain and suffering.

**COUNT VIII – STATE CLAIM**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**DEFENDANTS TOHATAN, FUENTES, VECCHIO, AND CITY OF CHICAGO**

237.   Each paragraph of this Complaint is incorporated as if restated fully herein.

238.   Defendant Officers, and CITY OF CHICAGO, by and through its agents, Defendant Officers, engaged in conduct that was extreme and outrageous, and intended to cause or recklessly or consciously disregarded the probability of causing severe emotional distress, and Desmen suffered severe emotional distress as a proximate result of Defendants' actions.

239.   As a proximate result of Defendants' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and physical and emotional pain and suffering.

**COUNT IX – FEDERAL CLAIM**
**POLICY AND PRACTICE**
**CITY OF CHICAGO**

240.   Each paragraph of this Complaint is incorporated as if restated fully herein.

241.   Defendant Officers' unlawful conduct was directly and proximately caused in whole or in part by one or more interrelated de facto policies, practices, and/or customs of the Chicago Police Department and City of Chicago, and the City of Chicago was aware of and deliberately indifferent to those constitutionally infirm policies.

242.   As a proximate result of Defendant's misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and physical and emotional pain and suffering.

**COUNT X – STATE CLAIM**
**INDEMNIFICATION**
**DEFENDANT CITY OF CHICAGO**

243.   Each paragraph of this Complaint is incorporated as if restated fully herein.

244.   At all relevant times, CITY OF CHICAGO was the employer of Defendant Officers.

245. Defendant Officers committed the acts alleged above under color of law and in the scope of their employment as employees of the CITY OF CHICAGO.

246. Illinois law provides that government entities are directed to pay any tort judgment for any damages for which employees are liable within the scope of their employment activities.

247. Should Defendant Officers be found liable on one or more of the claims set forth above, Plaintiff DESMEN NORTHINGTON demands, pursuant to Illinois law, that their employer, Defendant CITY OF CHICAGO, be found liable for any judgment plaintiff obtains against Defendant Officers, as well as attorney's fees and costs awarded, and for any additional relief this Court deems just and proper.

## PRAYER FOR RELIEF (ALL COUNTS)

For the foregoing reasons, the Plaintiff DESMEN NORTHINGTON prays for judgment against Defendants in a fair and reasonable amount, including compensatory and punitive damages, attorney fees and costs, and for any additional relief this Court deems just and proper.

## JURY DEMAND

The Plaintiff DESMEN NORTHINGTON requests a trial by jury.

Respectfully submitted,
DESMEN NORTHINGTON

/s/ Jordan Marsh
*Attorney for the Plaintiff*

**LAW OFFICE OF JORDAN MARSH LLC**
5 Revere Drive Suite 200
Northbrook, IL 60062
(224) 220-9000
jordan@jmarshlaw.com