**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DESMEN NORTHINGTON, | ) | |
| | ) | |
| | ) | Case Number: 24-cv-11466 |
| Plaintiff, | ) | |
| | ) | Honorable Jeffrey I. Cummings, |
| v. | ) | District Judge |
| | ) | |
| NICU TOHATAN, *et al.*, | ) | Honorable Beth W. Jantz, |
| | ) | Magistrate Judge |
| Defendants. | ) | |

**DEFENDANT CITY OF CHICAGO'S ANSWER TO
PLAINTIFF'S FIRST AMENDED COMPLAINT, AFFIRMATIVE DEFENSE,
AND JURY DEMAND**

Defendant, City of Chicago (hereinafter "Defendant" or "Defendant City"), by and through one of their attorneys, Leslie Wiesen, Assistant Corporation Counsel, for their answers, affirmative responses, and jury demand, state as follows:

**JURISDICTION AND VENUE**

1. This action arises under the Constitution of the United States, particularly the Fourth and Fourteenth Amendments to the Constitution of the United States, under the laws of the United States, particularly the Civil Rights Act, Title 42 of the United States Code, §§ 1983 and 1988, and under the laws of the State of Illinois.

**ANSWER: Defendant City admits that Plaintiff purports to bring this action under the Codes and Amendments listed in this paragraph, as well as under the laws of the State of Illinois, but denies any wrongdoing alleged.**

2. The jurisdiction of this Court is invoked under the provisions of Title 28 of the United States Code, §§ 1331 and 1343. Plaintiff also invokes the supplemental jurisdiction of this Court pursuant to Title 28 of the United States Code, Section 1367.

**ANSWER: Defendant City admits that jurisdiction is proper but denies the allegations against it and further denies any wrongdoing alleged herein.**

1

3.     This Court has jurisdiction over this action pursuant to Title 28 of the United States Code §§ 1331 and 1367, as Plaintiff asserts claims under federal law and the state law claims arise out of the same facts as the federal claims. Venue is proper in the United States District Court for the Northern District of Illinois under Title 28 of the United States Code, § 1391(b)(2), as the events complained of occurred within this district.

**ANSWER: Defendant City admits that jurisdiction is proper but denies the allegations against it and further denies any wrongdoing alleged herein.**

PARTIES

4.     At all times relevant herein, Plaintiff DESMEN NORTHINGTON (hereinafter "Desmen") was a resident of Chicago, Cook County, and resided in the Northern District of Illinois. Desmen is Black.

**ANSWER: Defendant City lacks knowledge or information sufficient to admit or deny the allegations contained in this paragraph.**

5.     Defendants TOHATAN, FUENTES, VECCHIO, CARMEN, KITTRELL, and SUNDE ("Defendant Officers") are sued in their individual capacities and were at all times relevant, sworn tactical police officers employed by Defendant CITY OF CHICAGO, and were acting within the scope of their agency, service and/or employment with the CITY OF CHICAGO, and were acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Illinois.

**ANSWER: Defendant City admits that the named Defendant Officers are purportedly being sued in their individual capacities and, at all times relevant hereto, were employed by the City of Chicago as Police Officers. Defendant City further admits, upon information and belief, that the named Defendant Officers were acting within the scope of their employment and under color of law, but denies wrongdoing.**

6.     Defendant, CITY OF CHICAGO, is a government entity operating within the State of Illinois. The CITY OF CHICAGO is responsible for the actions of its employees while acting within the scope of their employment. At all times relevant to this action, CITY OF CHICAGO was the employer of Defendants TOHATAN, FUENTES, VECCHIO, CARMEN, KITTRELL, and

SUNDE.

**ANSWER: Defendant City admits it is an Illinois municipal corporation and that it is the employer of the named Defendant Officers. Defendant City further admits that under certain circumstances and to the extent provided by law, it can be held liable as principal for torts committed by its agencies acting within the scope of their employment.**

<u>FACTS</u>

7.    This matter arises from an unlawful stop by Chicago police of an African-American motorist named Desmen Northington.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

8.    The stop led to an unlawful detention in which Desmen was forcibly yanked out of the car, subjected to excessive force, handcuffed and detained for more than 10 minutes while being insulted, mocked and threatened by several officers.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

9.    The unlawful stop was based on Desmen's alleged failure to have his hazard lights activated in a stopping zone, which should have resulted in nothing more than a parking ticket.

**ANSWER: Defendant City denies that the allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

10.    Yet Desmen was subjected to a harrowing encounter with police, who intentionally escalated a minor parking infraction to an unlawful detention, continuously insulted and berated him, threatened to get him fired and to have his Concealed Carry License revoked, illegally searched his car, and then falsified a report to justify their conduct.

**ANSWER: Defendant City admits that Plaintiff was stopped for failing to have his hazard lights activated in a stopping zone. Defendant City denies the remaining allegations contained within this paragraph.**

**THE INCIDENT**

11.    On September 23, 2024, at approximately 7:06 p.m., Desmen was in his vehicle, which was stopped in a standing zone at or near 147 East Superior Street in Chicago, Illinois.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

12.    Desmen had just returned to his car from a nearby store and was inputting his friend's

address into the map/GPS function of his phone.

**ANSWER: Defendant City lacks knowledge as to the truth of the allegations contained within this paragraph.**

13.    Defendant officers drove past Desmen, saw that he was black, then pulled their squad car

in front of Desmen's car.

**ANSWER: Defendant City admits that Defendant Officers pulled their squad car in front of Plaintiff's car. Defendant denies the remaining allegations contained within this paragraph.**

14.    Defendant Officers approached Desmen, who lowered his window.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

15.    Desmen had his phone in his right hand and was lowering his window with his left hand.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

16.    Tohatan pointed his flashlight at Desmen and informed him he was supposed to have his

flashers on.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

17.    As Desmen began to speak, Tohatan cut him off and asked Desmen if he was the owner of

the car.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

18.    Desmen confirmed it was his car.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

19.    Desmen informed Tohatan that he just got back from a nearby store and pointed to a bag

in his passenger seat.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

20.    Tohatan asked to see Desmen's license and insurance.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

21.    When Desmen asked why he needed to show his license and insurance, Defendant Fuentes said, "You're being stopped by the police, so we're requesting your license and insurance – can you roll the windows down on your vehicle?"

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

22.    "For what – what's the issue?" asked Desmen.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

23.    Tohatan said, "You're parked in a tow zone with no flashers. Can I see your license and insurance."

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

24.    Desmen reached into his front pocket and retrieved his driver's license and insurance card. While he was doing this, Tohatan said, "Lower the windows down, please."

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

25.    "There's no one else in the vehicle", said Desmen.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

26.    Fuentes knocked on Desmen's rear window and said "[w]e gotta be able to see, roll down your windows."

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

27.    Desmen, who was still attempting to provide his license and insurance to Tohatan, said again, "[t]here's no one else in the vehicle".

**ANSWER: Defendant City denies that the allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

28.    Fuentes said, "Come on out then."

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

29.     When Desmen objected and requested a sergeant, Fuentes opened the driver's door and said, "Come on out or we'll rip you out."

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

30.     When Desmen hesitated, Fuentes grabbed Desmen and began to jerk him out of the car.

**ANSWER: Defendant City denies that the allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

31.     Desmen exited his car, and the officers grabbed him and turned him around and began to handcuff him behind his back.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

32.     As Tohatan began to handcuff Desmen, and the officers held him against his car, Desmen said, "I'm not doing anything!"

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

33.     "Then listen!" yelled Fuentes furiously. "When we say get out you get out!"

**ANSWER: Defendant City admits that Officer Fuentes made the statement quoted in this paragraph but denies that the remaining allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

34.     "I asked you for a license three times," said Tohatan. "You ask me why I'm asking for your license, are you stupid?"

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

35.     Once Desmen was handcuffed, Fuentes said, "You're going to jail."

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

36.     "He was moving his hands when I walked out of the car," said Tohatan to the other officers.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

37.     Tohatan and other officers proceeded to search the interior of Desmen's car after Desmen

was walked to the curb.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

38. When Desmen said he had the right to question why he was being asked to produce his license and insurance, Fuentes said, "No! You don't have the right! You have the right to go to jail!"

**ANSWER: Defendant City denies that the allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

39. Fuentes told Desmen his father should have raised him better.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

40. Tohatan began screaming at Desmen as he sat on the curb in handcuffs. "We're the police, when we're telling you 'Roll the windows down, you roll the windows down," he yelled. "When asked for a license you give me a license you're not asking me this is not a stop," he continued. "It's a license insurance. Three times I ask you!"

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

41. Desmen corrected Tohatan: "No you didn't, you asked me twice and I said –"

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

42. Tohatan cut off Desman: "That's enough!" he yelled. "I don't have to ask you twice!"

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

43. Meanwhile the officers continued to illegally search Desmen's car.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

44. Vecchio removed a bottle of tequila from Desmen's trunk – where it was legally stored – and emptied it out on the street.

**ANSWER: Defendant City admits that Defendant Officer Vecchio removed a bottle of tequila from Plaintiff's trunk and emptied in on the street. Defendant City denies the remaining allegations contained within this paragraph fully and completely describe the circumstances and therefore denies them.**

45.     "Guess you're gonna learn to listen today, man", said Vecchio as he unzipped a duffel in Desmen's trunk and dumped its contents out.

**ANSWER: Defendant City admits that Officer Vecchio made the statement quoted in this paragraph but denies that the remaining allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

46.     When Desmen requested a sergeant to be called to the scene, Vecchio refused, saying sarcastically, "Yeah, I'm going to start listening to everything that you want me to do."

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

47.     Fuentes chimed in: "Yeah, right. You don't want to listen to us but we gotta listen to you?"

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

48.     "When we say roll down the windows, you roll 'em down – you don't question us", said Fuentes.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

49.     The search revealed no contraband or other evidence of criminal conduct.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

50.     Vecchio approached Desmen, who was still sitting on the curb in handcuffs, and said, "Wait, man, you got your CDL [Commercial Driver's License]? And you got all the liquor? You drive for a living and you're gonna act like this with all the liquor?"

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

51.     When Desmen tried to answer, Vecchio cut him off: "Really – how 'bout you lose your job today?"

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

52.     "Are you sorry?" Vecchio asked Desmen.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

53.    When Desmen said "No" and tried to explain that he was just trying to put his friend's address into his GPS, Vecchio slammed Desmen's trunk shut and said, "Wrong answer."

**ANSWER: Defendant City admits that Officer Vecchio made the statement quoted in this paragraph but denies that the remaining allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

54.    "You're a punk", Vecchio said.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

55.    Desmen said, "I'm what?"

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

56.    "A punk", said Vecchio.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

57.    "And you've got a CCL [Concealed Carry License]?" Vecchio asked Desmen incredulously.

**ANSWER: Defendant City admits that Officer Vecchio made the statement quoted in this paragraph but denies that the remaining allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

58.    When Desmen answered that he did have a CCL, Vecchio said, "I think we're gonna revoke that after this. For this behavior. That's bad behavior. Scary behavior."

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

59.    "You're a clear and present danger," said Fuentes.

**ANSWER: Defendant City denies that Officer Fuentes said this exact quote and therefore denies the allegations contained in this paragraph.**

60.    "This is bad behavior", said Vecchio – again. "Really bad."

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

61.    Fuentes falsely claimed Desmen's license plates were expired.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

62. As Desmen protested, Fuentes said, "Dude, we do this about 100 times a night. You think you're the only one?"

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

63. As the officers continued to lecture and berate Desmen, Vecchio said, "You started all the problems. You started it all."

**ANSWER: Defendant City admits that Officer Vecchio made the statement quoted in this paragraph but denies that the remaining allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

64. Later, as Desmen tried to explain why he was so stunned by the officers' conduct, Vecchio laughed, and said, "You're so dramatic and theatrical, man."

**ANSWER: Defendant City admits that Officer Vecchio made the statement quoted in this paragraph but denies that the remaining allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

65. Defendant officers claimed Desmen had "liquor all over", speculated aloud that Desmen was intoxicated, and later claimed that one of the officers "smelled a strong odor of alcoholic beverage emanating from the vehicle".

**ANSWER: Defendant City admits that Officer Vecchio made the statement quoted in this paragraph but denies that the remaining allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

66. Despite this, Defendant Officers never gave Desmen a breathalyzer or conducted any sobriety tests.

**ANSWER: Defendant City admits that officers never gave Plaintiff a breathalyzer or conducted any sobriety tests but deniesthat the remaining allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

67. Vecchio released Desmen from his handcuffs.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

68.    Before he finished removing the handcuffs, Vecchio asked Desmen – again – if he was sorry.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

69.    Defendants CARMEN, KITTRELL, and SUNDE arrived moments after the incident began, and observed the conduct of Defendants Vecchio, Fuentes and Tohatan for approximately eight minutes without intervening to prevent further violation of Desmen's constitutional rights.

**ANSWER: Defendant City denies that the allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

70.    Defendant Kittrell took part in lecturing Desmen about "listening to the police" while the events described herein occurred.

**ANSWER: Defendant City denies that the allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

71.    Vecchio released Desmen from his handcuffs.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

72.    Before he finished removing the handcuffs, Vecchio asked Desmen – again – if he was sorry.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

73.    As Vecchio released Desmen, Defendant Carmen or Sunde was unable to suppress a smirk.

**ANSWER: Defendant City denies that the allegations contained in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

74.    Defendant Carmen or Sunde shook his head and smiled before turning away.

**ANSWER: Defendant City denies that the allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

75.    Fuentes acted as if he was upset that Vecchio was releasing Desmen. "I would take him to jail. I'm gonna walk away", he said sarcastically. "I feel so absurd after this."

**ANSWER: Defendant City denies that the allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

76.    After all of the yelling, and the false accusations that Desmen was intoxicated, that there was liquor all over his car, that he was "a clear and present danger", that Desmen should lose his job and have his licenses revoked, the officers released Desmen without conducting a sobriety test, without charging him with a crime, and without writing him a parking ticket.

**ANSWER: Defendant City admits that officers released Plaintiff without charging him with a crime or writing him a parking ticket, but denies that the remaining allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

77.    Ultimately, it took five or six tactical police officers and two squad cars more than 10 minutes to handle an alleged parking infraction that did not even result in a ticket.

**ANSWER: Defendant City denies that allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

## THE FALSE REPORT

78.    One or more of the Defendant Officers completed an Investigatory Stop Report ("ISR") that was riddled with falsehoods.

**ANSWER: Defendant City admits that an investigatory stop report was completed, but denies the remaining allegations contained within this paragraph.**

79.    Defendants claimed in the ISR that they pulled up in front of Desmen's stopped car (as opposed to behind the car) "in an attempt not to block traffic on the one way street".

**ANSWER: Defendant City admits that the ISR states "in an attempt not to block traffic on the one way street." Defendant City denies the remaining allegations truly and accurately reflect the facts and circumstances and, therefore, denies the remaining allegations.**

80.    This rationale was obviously false, for several reasons:

a. There were several car lengths of space immediately behind Desmen's car where the officers could have parked or stopped without obstructing traffic.

b. When the officers pulled in front of Desmen's car, they parked at an angle with the rear of their SUV sticking out into a moving traffic lane.

c. After the initial approach by Defendant Officers, another police SUV parked behind Desmen's car in a moving lane, completely blocking the lane.

d. Officers are trained to pull up and approach vehicles from behind for officer safety.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

81. Defendant Officers' statement that they pulled up in front of Desmen to avoid blocking traffic was an obvious pretext for the real reason: so they could see if Desmen was black before they decided whether to approach and detain him.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

82. Defendant Officers claimed in the ISR that they observed Desmen "reaching towards the back seat area and making furtive movements downwards."

**ANSWER: Defendant City admits that the ISR states the phrase "reaching towards the back seat area and making furtive movements downwards." Defendant City denies the remaining allegations truly and accurately reflect the facts and circumstances and, therefore, denies the remaining allegations.**

83. This was false. Desmen never reached towards the back seat or made furtive movements downwards. He was clearly sitting up in his seat, holding his phone with his right hand and lowering the window with his left hand as the officers approached.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

84. Defendant Officers falsely claimed in the ISR that Desmen refused to produce his driver's license and insurance.

**ANSWER: Defendant City denies that the allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

85.     In fact, Desmen was complying with the request for his license and insurance – pulling them out of his pocket and preparing to hand them to Tohatan – when Tohotan ordered him to lower his windows at the same time.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

86.     Defendant Officers claimed in the ISR that they "assisted" Desmen out of his car "in an attempt to avoid an escalation", when in fact Fuentes forcefully yanked him from the driver's seat and needlessly escalated the situation.

**ANSWER: Defendant City denies that the allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

87.     Defendant Officers claimed in the ISR that they found a bottle of tequila in "the immediate reachable area of the vehicle."

**ANSWER: Defendant City denies that the allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

88.     This too is false. The bottle of tequila was in the trunk of the car. The officers could not reach the bottle from the back seat, even after they pulled one of the seats down. Instead, they had to open the trunk itself to get to the bottle.

**ANSWER: Defendant City denies this characterization of the report and the incident as alleged. Defendant City admits that the bottle of tequila was in the trunk of the car and admits that the ISR states said bottle was found in the "Cargo areas." The remaining allegations contained in this paragraph are vague, argumentative, and incomplete statement of the occurrence, and, therefore, Defendant City denies them.**

89.     Defendant Officers stated in the ISR that "several police officers explained to the driver on scene that his behavioral [sic] will not be tolerated on the public way."

**ANSWER: Defendant City admits that ISR states that "several police officers explained to**

the driver in scene that his behavioral will not be tolerated on the public way." **Defendant City denies the remaining allegations truly and accurately reflect the facts and circumstances and therefore denies the remaining allegations.**

90.     This was true to a point. Defendant Officers spent much of the detention mocking and

lecturing Desmen about listening to and complying with the police and not asking questions.

**ANSWER: Defendant City denies that the allegations in this paragraph truly and accurately reflect the facts and circumstances and, therefore, denies the allegations contained within this paragraph.**

91.     After Defendant Officers released Desmen and left the scene, his car was a mess. Tylenol

pills were scattered throughout the front seat area, mail had been opened, and bags had been dumped

out.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

92.     After Defendant Officers left the scene, Desmen called 911 to issue a formal complaint

against them.

**ANSWER: Defendant City admits Plaintiff called 911 after the Defendant Officers left the scene. Defendant City lacks knowledge as to the truth of the remaining allegations contained within this paragraph.**

93.     A sergeant – Sgt. Eric Seng – came to the scene within minutes.

**ANSWER: Defendant City admits upon information and belief the allegations contained in this paragraph.**

94.     After Desmen told Seng what had happened, Seng said that the officers involved were his

officers and tried to explain the officers' behavior by telling Desmen, "Just the way that downtown's

been, we have more aggressive officers down here."

**ANSWER: Defendant City admits Sgt. Seng said the quoted language but denies this truly and accurately captures the facts and circumstances as they occurred, and therefore denies the remaining allegations contained in this paragraph.**

95.     Sgt. Seng told Desmen that he would watch the bodycameras of his officers and that he

may end up suspending one or more of the officers for a day or two, telling Desmen, "that's a big

chunk of change" out of their pocket. "That's probably what you're looking at as far as punishment as far as the officers", he told Desmen.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

96.    Seng told Desmen that he would call Desmen after he viewed the bodycamera footage and would let him know how he planned to handle the discipline, and that if chose to do so, Desmen could contact the Civilian Office of Police Accountability ((COPA) if he still wanted to do more.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

97.    The following day, Seng called Desmen and said that he was embarrassed by the officers' behavior. He told Desmen he planned to suspend Vecchio for one day and issue written reprimands to the other two officers.

**ANSWER: Defendant City admits that Sgt. Seng called Desmen the next day. Defendant City denies the remaining allegations contained in this paragraph.**

98.    When Desmen informed Seng that he still intended to pursue the matter, Seng's tone changed, and he told Desmen if he was looking for a "cash cow", he would probably not be successful.

**ANSWER: Defendant City denies the allegations contained in this paragraph.**

99.    On information and belief, Seng never pursued any disciplinary conduct of Defendant Officers after he reviewed the bodycamera footage.

**ANSWER: Defendant City admits that Sgt. Seng reviewed the Defendant Officers body-worn camera footage but denies the remaining allegations accurately reflect the facts and circumstances and, therefore, denies the remaining allegations.**

## CPD'S LONGSTANDING PATTERN AND PRACTICE OF RACIALLY DISCRIMINATORY TRAFFIC AND INVESTIGATORY STOPS

100.    Chicago police have a longstanding practice of disproportionately targeting Black and Hispanic drivers for traffic and pedestrian stops.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

101.    Defendant Officers stopped Desmen pursuant to a de facto policy and practice within

the Chicago Police Department of disproportionately targeting Black drivers in baseless, pretextual stops as a means to search them and their vehicles, in the hopes of finding contraband or other basis to arrest and criminally charge the Black drivers or occupants of the vehicle. This includes pulling over moving vehicles, approaching stopped or parked vehicles, and stopping pedestrians.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

## DOJ Report

102.    In 2015, the United States Department of Justice (hereinafter "DOJ") Civil Rights Division and Special Litigation Section, as well as the United States Attorney's Office for the Northern District of Illinois, initiated an investigation of the Chicago Police Department and the then-existing Independent Police Review Authority (hereinafter "IPRA").

**ANSWER: Defendant City admits the allegations contained within this paragraph but denies any wrongdoing or misconduct.**

103.    The DOJ report was released on January 13, 2017.

**ANSWER: Defendant City admits the allegations contained within this paragraph but denies any wrongdoing or misconduct.**

104.    According to the January 13, 2017, DOJ report, Black Chicagoans have been disproportionately targeted for decades by the Chicago police department and have been subjected to disproportionately higher rates of stops, searches, arrests, charges, and uses of force than white Chicagoans.

**ANSWER: Due to the vague nature of the allegations set forth in this paragraph, specifically, the lack of precise time frame and the definition for the term "disproportionately targeted," Defendant City lacks knowledge or information sufficient to admit or deny the allegations contained within this paragraph.**

105.    The DOJ found that CPD did not adequately train or supervise its officers, noting that "CPD does not provide officers or supervisors with adequate training and does not encourage or facilitate adequate supervision of officers in the field. These shortcomings in training and supervision

result in officers who are unprepared to police lawfully and effectively; supervisors who do not mentor or support constitutional policing by officers; and a systemic inability to proactively identify areas for improvement, including Department-wide training needs and interventions for officers engaging in misconduct."

**ANSWER: Defendant City admits that the language quoted within this paragraph can be found on page ten of the January 13, 2017 DOJ Report but denies any further allegations and, further, denies any wrongdoing or misconduct.**

### State of Illinois Lawsuit and the 2019 Consent Decree

106.    In August 2017, the State of Illinois sued the City of Chicago, seeking to "ensure the City enacts comprehensive, lasting reform of the Chicago Police Department ("CPD"), the Independent Police Review Authority ("IPRA"), and the Chicago Police Board ("Police Board"). *State of Illinois v. City of Chicago*, Case No. 17-cv-6260, (Northern District of Illinois, August 29, 2017), Dkt. 1.

**ANSWER: Defendant City admits that the language quoted within this paragraph can be found in the complaint for *State of Illinois v. City of Chicago*, Case No. 17-cv-6260 but denies any remaining allegations and, further, denies any wrongdoing or misconduct.**

107.    In its lawsuit, the State noted that "[f]or nearly 50 years, reviews of CPD's policing practices have identified significant failures by CPD officers to act lawfully." Id. at ¶ 3.

**ANSWER: Defendant City admits that the language quoted within this paragraph can be found in the complaint for *State of Illinois v. City of Chicago*, Case No. 17-cv-6260 but denies any wrongdoing or misconduct.**

108.    The State alleged that the City was deliberately indifferent to the repeated pattern of CPD's use of excessive force and racially discriminatory policing practices, and that External complaints, threatened and actual lawsuits, and government commissioned reports, along with the media's frequent coverage of CPD's repeated use of excessive force and racially discriminatory police action, have put the City on notice of CPD's unconstitutional conduct

**ANSWER: Defendant City admits that the State of Illinois made the allegations referenced within this paragraph in the complaint for *State of Illinois v. City of Chicago*, Case No. 17-cv-6260 but denies any remaining allegations and, further, denies any wrongdoing or misconduct.**

18

109.     As a result of the State's lawsuit, the City entered into a Consent Decree, in which the City agreed to institute many reforms to bring CPD's conduct into compliance with the U.S. and Illinois constitutions and other applicable laws. (Dkt. 703-1.)

**ANSWER: Defendant City admits that it entered into a consent decree in the case *State of Illinois v. City of Chicago*, Case No. 17-cv-6260, and admits that in so doing it agreed to institute certain reforms. The City denies the remaining allegations contained in this paragraph and denies any wrongdoing or misconduct.**

110.     The Consent Decree, which became effective March 1, 2019, was established "to ensure that the City and CPD deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve, and promotes community and officer safety."

**ANSWER: Defendant City admits the language quoted within the allegations of this paragraph can be found in the Consent Decree but denies any remaining allegations and, further, denies any wrongdoing or misconduct.**

111.     The Decree further sought to "ensure that Chicago police officers are provided with the training, resources, and support they need to perform their jobs professionally and safely." The Decree required changes in the areas of community policing; impartial policing; crisis intervention; use of force; recruitment, hiring, and promotions; training; supervision; officer wellness and support; accountability and transparency; and data collection, analysis, and management. (Consent Decree, Dkt. 703-1, at 8.)

**ANSWER: Defendant City admits the language quoted within the allegations of this paragraph can be found in the Consent Decree but denies any remaining allegations and, further, denies any wrongdoing or misconduct.**

112.     U.S. District Judge Robert M. Dow appointed Independent Monitor Margaret M. Hickey, who leads an Independent Monitoring Team ("IMT") which would monitor and evaluate the City's compliance with the Consent Decree, and issue quarterly progress reports. (Id., Dkt. 713.)

**ANSWER: Defendant City admits the allegations contained within this paragraph but denies**

**any wrongdoing or misconduct.**

113.    The City agreed to attempt to meet all of the requirements of the Consent Decree within five years of its effective date. (Consent Decree, ¶ 714.)

**ANSWER: Defendant City admits the allegations contained within this paragraph but denies any wrongdoing or misconduct.**

114.    On March 25, 2022, the Consent Decree was extended an additional three years because of "missed deadlines and lagging compliance". (Dkt. 1011.)

**ANSWER: Defendant City denies that the language quoted within this paragraph appears in docket entry 1011 for *State of Illinois v. City of Chicago*, Case No. 17-cv-6260 but denies the remaining allegations contained in this paragraph.**

115.    In June 2023, the IMT reported that the City had only achieved 82 percent preliminary compliance with the provisions of the Consent Decree and had only achieved full compliance of six percent of the Decree's provisions. (Dkt. 1097 at 4.)

**ANSWER: Defendant City admits that Docket No. 1097 at p. 4 states as follows: "At the end of the seventh reporting period, the City and the CPD achieved Preliminary Compliance to about 82% of monitorable paragraphs, Secondary compliance to about 25%, and Full compliance with 6%." Defendant City denies any remaining allegations, denies the argumentative nature of this paragraph, and denies any wrongdoing or misconduct.**

116.    Sharon Fairley, a University of Chicago Law School professor who previously served as chief administrator of the Independent Police Review Authority, told WTTW News, "Clearly, from the monitor's semi-annual reports, the department is not as far along with compliance as they could or should be at this point."[1]

**ANSWER: Defendant City admits that Sharon Fairley was a former chief administrator of the Independent Police Review Authority and further admits that on August 28, 2023, a WTTW news article titled "Examining the Chicago Police Department's Progress on the Consent Decree Almost 5 years Into the Process" was released and the language contained within this paragraph can be found in the article but lacks knowledge relating to Ms. Fairley's position at the University of Chicago Law School. The City denies any remaining allegations and, further, denies any wrongdoing or misconduct.**

---

[1] Guthmann, Andrea, *Examining the Chicago Police Department's Progress on the Consent Decree Almost 5 Years Into the Process*, WTTW News, accessible at http://tiny.cc/c0y8001.

117.     The Illinois deputy attorney general charged with overseeing the consent decree said that the city and CPD had "resisted commonsense" proposals to fix major problems.[2]

**ANSWER: Defendant City admits that in July 2023, the Manhattan Institute released an article titled "Is the Chicago Consent Decree Working? Consent Decrees for Police Reform: The Chicago Experience" and the language quoted within this paragraph can be found in the article but denies any remaining allegations and, further, denies any wrongdoing or misconduct.**

118.     On June 14, 2023, the City's former Inspector General, Joe Ferguson, filed a public comment in the Consent Decree litigation. Ferguson expressed frustration with the City's halting progress of compliance with the consent decree and called for a "hard reset" and a "fresh start" for oversight of the decree, "because Consent Decree implementation and monitoring is a faltering undertaking both in substantive accomplishment and in transparency. In the absence of a hard methodological and operational reset, I believe the Consent Decree is at high risk of failing to achieve its objectives." (Dkt. 1092 at 1.)

**ANSWER: Defendant City admits that Docket 1092 at page 1 of *State of Illinois v. City of Chicago*, Case No. 17-cv-6260 contains the language that is quoted within this paragraph but denies that the allegations contained within this paragraph are a proper characterization of Joseph Ferguson's written statement and therefore denies any remaining allegations and further denies any wrongdoing or misconduct.**

119.     The City's failure to comply with the Consent Decree continues to this day and is embodied in the types of incidents described herein.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

120.     According to the CPD Consent Decree Independent Monitoring Report 9, "the City and the CPD continued to struggle to make progress toward compliance" with impartial policing

---

[2] *Is the Chicago Consent Decree Working? Consent Decrees for Police Reform: The Chicago Experience*, Charles Fain Lehman, Manhattan Institute, July 20, 2023, accessible at https://tinyurl.com/4hst87he.

requirements in the Consent Decree.[3]

**ANSWER: Defendant City admits that IMT Report 9, filed on May 23, 2024, contains the language quoted within the allegations of this paragraph, but denies that the allegations contained within this paragraph are a proper characterization of the IMT Report and therefore denies any remaining allegations and further denies any wrongdoing or misconduct.**

121.     As of December 31, 2023, the City and CPD had achieved preliminary compliance with

eight provisions of the consent decree regarding impartial policing, secondary compliance with 12

provisions, and no compliance with nine provisions.

**ANSWER: Defendant City denies that the allegations contained within this paragraph are a complete and accurate statement of the information contained in IMT Report 9 and therefore denies the allegations contained in this paragraph. The City further denies any wrongdoing or misconduct.**

122.     The City and CPD had not made full compliance with any of the impartial policing

provisions of the Consent Decree.

**ANSWER: Defendant City admits that it has not achieved full compliance with certain provisions of the Consent Decree but denies that level of compliance is indicative of wrongful conduct.**

123.     In the 10th Independent Monitoring Report, issued on November 19, 2024, the IMT

reported that "the City's and the CPD's progress toward compliance with these important [impartial

policing] requirements remained largely unchanged from the previous reporting period."[4]

**ANSWER: Defendant City denies that the allegations contained within this paragraph are a complete and accurate statement of the information contained in the IMT Report 10 and therefore denies the allegations in this paragraph and further denies any wrongdoing or misconduct.**

124.     The IMT noted that "the City and the CPD have not reached any level of compliance with

five paragraphs in the Impartial Policing section, which is concerning".[5]

**ANSWER: Defendant City admits that the language quoted within the allegations on this**

---

[3] Chicago Police Department Consent Decree, Independent Monitoring Report 9, July 1, 2023 – December 31, 2023, p. 24, available at https://tinyurl.com/3u67ja6s.
[4] Chicago Police Department Consent Decree, Independent Monitoring Report 10, January 1, 2024 - June 30, 2024, p. 24, available at https://tinyurl.com/64fmhxun.
[5] *Id.* at p. 26.

paragraph are on page 26 of IMT Report 10, but denies that the allegations within this paragraph are a complete and accurate statement of the information contained on page 26 and therefore denies any remaining allegations. The City further denies any wrongdoing or misconduct.

### OIG Report

125.     According to a March 1, 2022, Office of Inspector General ("OIG") Report on Race and Ethnicity-Based Disparities in Chicago Police Department's Use of Force, "quantitative evidence from investigatory stop and traffic stop data shows an overwhelming disparity in the rates at which Black and non-Black people were stopped by the police. The overrepresentation of Black people among those stopped by the police was consistent across traffic stops and investigatory stops, and it was persistent across every CPD District, notwithstanding differences in District crime rates and the demographic composition of District populations."[6]

**ANSWER: Defendant City admits that the language quoted in this paragraph is in the March 1, 2022 OIG Report titled Report on Race and Ethnicity-Based Disparities in Chicago Police Department's Use of Force but denies any remaining allegations and, further, denies any wrongdoing or misconduct.**

126.     According to the data collected on investigatory stops, "Black people were subjected to a search of their person 1.5 times more frequently than non-Black people, and also subjected to a pat-down 1.5 times more frequently than non-Black people."[7]

**ANSWER: Defendant City admits that the language quoted in this paragraph is in the March 1, 2022 OIG Report titled Report on Race and Ethnicity-Based Disparities in Chicago Police Department's Use of Force but denies any remaining allegations and, further, denies any wrongdoing or misconduct.**

127.     Moreover, "Black people were also subjected to a vehicle search more often than non-Black people. Black motorists' vehicles were searched in 0.95% of traffic stops, which made searches of Black motorists' vehicles 3.3 times more frequent than searches of White motorists' vehicles (0.29%

---

[6] *Ethnicity-Based Disparities in Chicago Police Department's Use of Force,* City of Chicago Office of Inspector General, (March 1, 2022), pp. 31-32, available at https://igchicago.orglwp-contentluploads/2022/02/Use-of.Force-Disparities-Report. pdf.
[7] *Id.*

of traffic stops of White motorists) and 1.6 times more frequent than searches of all non-Black motorists' vehicles (0.60% of traffic stops of all non-Black motorists)."[8]

**ANSWER: Defendant City admits that the language quoted in this paragraph is in the March 1, 2022 OIG Report titled Report on Race and Ethnicity-Based Disparities in Chicago Police Department's Use of Force but denies any remaining allegations and, further, denies any wrongdoing or misconduct.**

128. A September 2022 OIG report identified "shortcomings related to the collection and management of litigation data involving CPD. These shortcomings limit the City's ability to understand areas of litigation risk to the City and to implement responsive improvements to CPD's operations and policies."[9]

**ANSWER: Defendant City admits that the language quoted in this paragraph is in the September OIG Report titled Use of Litigation Data in Risk Management Strategies for the Chicago Police Department but denies any remaining allegations and, further, denies any wrongdoing or misconduct.**

129. In an interview regarding the 2022 Report, Inspector General Deborah Witzburg acknowledged that the city was failing to improve CPD policy and practices stating,

> [w]e are paying out a lot of dollars without giving ourselves the opportunity to learn any lessons as a result. The city is not collecting the sort of information which would allow practices and policies to be improved[.] We should be learning lessons from settlements and judgments being paid out. Those are taxpayer dollars being paid out, either because there has been a finding that something went wrong or the city has made a determination to settle a claim that something went wrong. We are missing very expensive opportunities if we are not informing ourselves and improving practices and policies as a result of those settlements and judgments.[10]

**ANSWER: Defendant City admits that the quote contained within the allegations of this paragraph are from an interview of Deborah Witzburg but denies the characterizations of the statement and therefore denies the remaining allegations contained in this paragraph. The City further denies any wrongdoing or misconduct.**

---

[8] *Id.*

[9] *Use of Litigation Data in Risk Management Strategies for CPD,* City of Chicago Office of Inspector General, (September 29, 2022), available at https://tinyurl.com/yc5hd6n5.

[10] *Taxpayers shell out $250M in police-related settlements; new report slams city efforts to learn from those mistakes*, Fran Spielman, Chicago Sun Times, Sept 29, 2022, available at https://tinyurl.com/32da24yd.

130.     Underscoring Ms. Witzburg's comments, the City of Chicago recently approved (pending City Council authority) a $1.25 million settlement of a lawsuit stemming from the pretextual stop and subsequent shooting death of Dexter Reed in March 2024, which also resulted in the shooting injury of a police officer.

**ANSWER: Defendant City admits that a $1.25 million dollar settlement related to the Dexter Reed incident in March 2024 was proposed and avers that said proposal has not been approved by Chicago City Council. The City denies the remaining allegations contained within this paragraph and further denies any wrongdoing or misconduct.**

131.     Twenty-ninth ward Alderman Chris Taliaferro, Chair of the City Council's Police Committee, told the Chicago Sun-Times he believed the shooting was justified, but said that the seven-figure settlement was not unexpected "if the law department has concluded Reed should not have been stopped in the first place."[11]

**ANSWER: Defendant City admits that a Sun-Times article summarized comments made by Alderman Chris Taliaferro and that the quoted section of the above allegation is contained in the article. The City denies any remaining allegations as they are a summary of the purported statements without direct quotes and, further, denies any misconduct or wrongdoing.**

132.     The Sun-Times article notes that "[a] monitor of the 5-year-old federal consent decree that calls for reforms in the police department recommended traffic stops be added to the list of police activities that should be reexamined, but that has yet to happen."[12]

**ANSWER: Defendant City admits that the Sun-Times article contains the referenced quotation but denies any remaining allegations and, further, denies any misconduct or wrongdoing.**

133.     The City's indifference to its failure to achieve any significant progress in satisfying the requirements of the Consent Decree – and its corollary failure to reform itself in any meaningful way

---

[11] *Fatal police shooting of Dexter Reed leads to $1.25M settlement that includes reining in traffic stops,* Fran Spielman and Frank Main, Chicago Sun-Times, Feb. 3, 2025, accessible at https://tinyurl.com/v36xz3sh.
[12] *Id.*

– are illustrated, in part, by the statements of those who were directly involved in the attempts to reform CPD.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

134. In 2021, Chad Williams, the former civilian commanding officer of CPD's audit division, resigned after emailing Mayor Lori Lightfoot to say that "my disappointment with the inability of this department's top leadership to even feign interest in pursuing reform in a meaningful manner has made it impossible for me to remain involved."[13]

**ANSWER: Defendant City admits that Mr. Williams was employed by CPD, resigned, and that the quotation above is contained in the Chicago Tribune article cited at footnote 13. The City denies that said article fully describes the circumstances and therefore denies any remaining allegations. The City further denies any misconduct or wrongdoing.**

135. In August 2022, the City unceremoniously fired Robert Boik, CPD's executive director of constitutional policing and reform. Arne Duncan, former U.S. Secretary of Education and founder of violence prevention organization Chicago CRED, wrote in a statement that "Bob Boik was fired for blowing the whistle and telling the truth — that he has no support and that the administration is not serious about police reform."[14]

**ANSWER: Defendant City admits that the language quoted within the allegations of this paragraph are contained in the article referenced herein at footnote 14. The City denies that the allegations contained in this paragraph fully describe the circumstances and further denies the characterization of the statement and therefore denies the remaining allegations contained in this paragraph.**

136. These facts evidence not only a deliberate indifference to the problems that resulted in the Consent Decree, but they also suggest an outright refusal to take any concrete steps toward reform, and an institutional hostility toward the idea of police reform.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

---

[13] *Chicago police director of reform fired following email to Superintendent David Brown over staff changes, sources say,* Chicago Tribune, https://tinyurl.com/yyn2e4a5.
[14] *Id.*

137.    They also explain the City's remarkable failure – year after year – to achieve significant compliance with the provisions of the Consent Decree.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

138.    The continued failure – as late as November 2024 – to make any significant progress on satisfying the requirements of the Consent Decree (as demonstrated by the foregoing findings of the IMT) is proof that the City's indifference remains to this date.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

*Wilkins* **Lawsuit**

139.    In a class action lawsuit filed against the City of Chicago last year by the American Civil Liberties Union, plaintiffs claim that traffic stops in Chicago skyrocketed after 2016 while stops throughout the rest of the state remained stable.[15]

**ANSWER: Defendant City admits that the American Civil Liberties Union filed a lawsuit against the City of Chicago last year and that the allegations in that complaint speak for themselves. The City denies any remaining allegations and further denies any wrongdoing or misconduct.**

140.    The *Wilkins* lawsuit is based in large part on data from the City's Office of Emergency Management and Communications (OEMC), and the Illinois Department of Transportation (IDOT).

**ANSWER: Defendant City admits that the *Wilkins* complaint mentions data from the City's Office of Emergency Management and Communication and the Illinois Department of Transportations, but denies any remaining allegations and further denies any wrongdoing or misconduct.**

141.    The *Wilkins* plaintiffs allege that "[s]ince 2016, CPD officers have targeted Black and Latino drivers with extremely high volumes of traffic stops, frisks, and searches, not for the purpose of enforcing traffic laws but to investigate, harass, and intimidate community members (also called "pretextual" stops) on the basis of race and national origin (the "mass traffic stop program")."[16]

---

[15] *Wilkins v. City of Chicago,* 23-cv-4072, Dkt. 87, ¶ 498.
[16] *Id.* at ¶ 2.

**ANSWER: Defendant City admits that the language quoted above is contained in the *Wilkins* complaint, but denies any remaining allegations and, further, denies any wrongdoing or misconduct.**

142.    The *Wilkins* plaintiffs allege further that CPD's pretextual traffic stops follow a typical pattern:

> CPD officers pull over a Black or Latino driver for an alleged minor traffic infraction... Regardless of whether the alleged infraction occurred, the actual purpose of these pretextual traffic stops is not to enforce traffic laws or write tickets (also called "citations"). Rather, CPD officers use the alleged minor traffic violation as an excuse to question and harass the driver about whether they have guns or drugs in the car. Often officers ask to search the car—or conduct a search without consent—and/or frisk the driver, looking for guns or drugs. Sometimes officers handcuff drivers while they search them and their vehicle. Most of the stops are pretextual because their real purpose is investigatory—to find guns, drugs, or other contraband. In over 99% of all stops, CPD officers do not find guns, drugs, or other contraband, in which case they typically let the driver go, without explanation or apology.[17]

**ANSWER: Defendant City admits that the language quoted above is contained in the *Wilkins* complaint, but denies any remaining allegations and, further, denies any wrongdoing or misconduct.**

143.    The above description from the *Wilkins* complaint is remarkably similar to what happened to Desmen on September 23, 2024. He was stopped for a minor parking infraction, his car was searched without his consent, the search revealed no guns, drugs or other contraband,[18] and Desmen was released without explanation or apology.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

144.    While most of the stops of the lead plaintiffs in Wilkins began with officers pulling over a moving vehicle, rather than officers approaching a stopped car, as they did in Desmen's case, there is no material difference between officer misconduct committed after they pull over a vehicle and officer misconduct committed after they approach a stopped vehicle. The indignity is the same. The

---

[17] *Id.* at ¶ 3.
[18] Defendant Officers claim in the ISR that they recovered contraband, but the bottle of tequila they found in the trunk was not contraband. It was legally contained in the trunk, and Defendant Officers' claim that it was accessible to the driver is patently false and disproved by the fact that officers were forced to open the trunk itself to access the bottle.

misconduct is the same.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

145.    According to the ACLU's study of IDOT data, CPD's traffic stops have ballooned in the last decade, from around 85,000 in 2015 to more than 535,000 stops in 2023.

**ANSWER: Defendant City admits that the numbers mentioned above are contained in the *Wilkins* complaint, but denies any remaining allegations and, further, denies any wrongdoing or misconduct.**

146.    In 2023, CPD officers stopped Black drivers at a rate 3.75 times that of white drivers and stopped Latino drivers at a rate 2.73 times that of white drivers.

**ANSWER: Defendant City admits that the numbers mentioned above are contained in the *Wilkins* complaint, but denies any remaining allegations because there is no context and, further, denies any wrongdoing or misconduct.**

147.    CPD's traffic stops yield almost no public safety benefits. Less than one-half of one percent of traffic stops in 2023 resulted in officers finding any contraband (such as weapons or drugs) after they searched a driver's vehicle.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

148.    In 2023, officers were more likely to find contraband in vehicles driven by white people, even though they were more likely to search cars driven by Black people.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

### Racial Disparities in CPD Investigative Stops

149.    In 2023, approximately 35 percent of Chicagoans were white, 29 percent were Black, and 29 percent were Hispanic.

**ANSWER: Based on data from the United States Census Bureau, Defendant City denies, upon information and belief, the allegations contained within this paragraph.**

150.    Yet according to a study by the Illinois Department of Transportation – based on data submitted by the City of Chicago – 66 percent of pedestrians stopped by Chicago police officers in 2023 were Black, and 7.3 percent were white.

**ANSWER: Defendant City admits that the percentages contained within the allegations in this paragraph are from the "2023 Illinois Pedestrian Stop Study – Part II" that can be found on the Illinois Department of Transportation website but denies any remaining allegations and, further, denies any misconduct or wrongdoing.**

151.    The numbers are even more stark in the 18th District, where the incident in question occurred: While white residents make up 73 percent of the 18th district, they are only 11 percent of the pedestrians stopped by Chicago police officers in 2023. Seventy-two percent of pedestrians stopped in the 18th district were Black, despite the fact that Black people make up only 6.7 percent of the district's residents.[19]

**ANSWER: Defendant City admits that the percentages contained within the allegations in this paragraph are from the "2023 Illinois Pedestrian Stop Study – Part II" that can be found on the Illinois Department of Transportation website but denies any remaining allegations and, further, deny any misconduct or wrongdoing.**

152.    The numbers are similar when applied to the Defendant Officers in this case.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

153.    According to ISR data from the Chicago Police Department, Defendant Fuentes was either the first officer or the second officer on 409 ISR stops between 2022 and 2024.

**ANSWER: Upon information and belief, Defendant City admits the allegations contained within this paragraph. The City denies, however, that these numbers alone are evidence of any wrongdoing or misconduct.**

154.    Of those 409 stops, nearly 80 percent involved Black civilians, and only 6 percent involved white civilians.

**ANSWER: Upon information and belief, Defendant City admits the allegations contained within this paragraph.**

155.    For the same period of time, Defendant Tohatan was involved as the first or second officer on 298 ISR stops.

**ANSWER: Upon information and belief, Defendant City admits the allegations contained**

---

[19] On information and belief, pedestrian stop data includes all ISRs, which include officers approaching a stopped vehicle.

within this paragraph.

156.     Of those 298 ISR stops, 254 – or 85 percent – involved Black civilians.

**ANSWER: Upon information and belief, Defendant City admits the allegations contained within this paragraph.**

157.     For the same period of time, Defendant Vecchio was involved as the first or second officer on 280 ISR stops.

**ANSWER: Upon information and belief, Defendant City admits the allegations contained within this paragraph.**

158.     Of those 280 ISR stops, 264 – nearly 95 percent – involved Black civilians.

**ANSWER: Upon information and belief, Defendant City admits the allegations contained within this paragraph.**

159.     These stops occurred in a district that is 73 percent white and only 6.7 percent Black.

**ANSWER: Upon information and belief, Defendant City admits the allegations contained within this paragraph.**

160.     But the number of stops is likely far greater than we know. In August 2024, Injustice Watch, along with a non-profit organization called Bolts, determined that "Chicago Police officers have secretly pulled over as many as 20,000 more drivers per month in the past year than they have reported publicly, in violation of a 2003 law requiring them to document every traffic stop".[20]

**ANSWER: Defendant City admits that the language quoted within the allegations of this paragraph are from the article referenced in this paragraph. Defendant City denies the speculation contained in this paragraph, denies the remaining allegations, and denies any misconduct or wrongdoing.**

161.     The investigation revealed, among other things, that "police department officials know the traffic stop data they report to state regulators are an undercount."[21]

**ANSWER: Defendant City admits that the language quoted within the allegations of this paragraph are from the article referenced in this paragraph. Defendant City denies the**

---

[20] Sabino, Pascal, *Chicago police made nearly 200,000 secret traffic stops last year*, Injustice Watch. Available at https://tinyurl.com/yjudkw7k.
[21] *Id.*

remaining allegations contained in this paragraph and, further, denies any misconduct or wrongdoing.

**Prior Lawsuits Against Defendant Officers**

162.    Defendant officers are no strangers to being accused of unlawful conduct similar to the conduct described in this complaint.

**ANSWER: Defendant City admits that certain of the Defendant Officers have been accused of conduct similar to that alleged here. Defendant City states the remaining allegations are vague, incomplete, and argumentative and, therefore, Defendant City denies the remaining allegations contained in this paragraph.**

163.    In *Haley v. Tohatan, et al.* (22-cv-1785), Defendant Tohatan was accused of unlawful search and seizure after he and Sgt. Edward Ranzzoni approached a stopped vehicle on West Erie Street on December 8, 2021, just four blocks from where the instant stop occurred.

**ANSWER: Defendant City admits Defendant Tohatan was named in the above-referenced lawsuit and admits that the allegations in that lawsuit speak for themselves. The City denies any misconduct or wrongdoing.**

164.    The plaintiff in *Haley* alleged that Tohatan ordered him out of his car, handcuffed him, and searched his car despite there being no probable cause or reasonable suspicion of any criminal conduct.

**ANSWER: Defendant City admits that the Plaintiff in the above-referenced lawsuit made the allegations contained within this paragraph but denies any misconduct or wrongdoing.**

165.    The City settled *Haley* for $38,000.

**ANSWER: Defendant City admits the allegations contained in this paragraph but denies any misconduct or wrongdoing. The City further denies that settlements are indicative of wrongdoing.**

166.    In *Partee v. Hasan* (2019-cv-3689), Defendant Tohatan and two other officers were accused of handcuffing the plaintiff and searching his car despite the fact that the plaintiff had done nothing illegal.

**ANSWER: Defendant City admits that the plaintiff in the above-referenced lawsuit made the allegations contained within this paragraph but denies any misconduct or wrongdoing.**

167. The City settled *Parte*e for $40,000.

**ANSWER: Defendant City admits the allegations contained in this paragraph but denies any misconduct or wrongdoing. The City further denies that settlements are indicative of wrongdoing.**

168. In *Farris v. City of Chicago et al.* (22-cv-1729), Defendants Tohatan and Fuentes were accused of excessive force, unlawful search, wrongful detention, and malicious prosecution after they approached a stopped vehicle.

**ANSWER: Defendant City admits the plaintiff in the above-referenced lawsuit made the allegations contained within this paragraph but denies any misconduct or wrongdoing.**

169. The City settled *Farri*s for $100,000.

**ANSWER: Defendant City admits the allegations contained in this paragraph but denies any misconduct or wrongdoing. The City further denies that settlements are indicative of wrongdoing.**

170. In *Wilson v. Vecchio* (24 cv 12371), Defendant Vecchio is accused of approaching the plaintiff's stopped car for a minor parking violation, unlawfully searching the plaintiff's vehicle, unlawfully detaining the plaintiff, using excessive force against the plaintiff, and denying the plaintiff equal protection.

**ANSWER: Defendant City admits that Defendant Vecchio is named in the above-referenced lawsuit and that the allegations in that lawsuit speak for themselves, but denies any misconduct or wrongdoing.**

171. In *Wilson,* Sgt. Seng is also accused of excessive force and denial of equal protection, and Seng is accused of failing to intervene in Vecchio's alleged unlawful conduct.

**ANSWER: Defendant City admits plaintiff in the above-referenced lawsuit made the allegations contained within this paragraph but denies any misconduct or wrongdoing.**

172. *Wilson* remains pending.

**ANSWER: Defendant City admits the allegations contained in this paragraph but denies any misconduct or wrongdoing.**

173. In *Ipaye v. City of Chicago et al.* (24-cv-8958), Defendant Tohatan is accused of approaching

the plaintiff as he was putting air into the tires of a car and unlawfully seizing the plaintiff and searching

his bag. Defendant Vecchio is accused of searching the plaintiff's vehicle and person without consent

or probable cause.

**ANSWER: Defendant City admits that plaintiff made the allegations contained in this paragraph in the above-referenced lawsuit but denies any misconduct or wrongdoing.**

174. *Ipaye* remains pending.

**ANSWER: Defendant City admits that *Ipaye* has not been dismissed, but denies that it remains pending (See ECF No. 37 of 24-cv-8958). The City further denies that settlements are indicative of wrongdoing.**

175. The cases cited above are just the tip of the iceberg when it comes to lawsuits against

Chicago police for unlawful stops and searches.

**ANSWER: Defendant City denies the allegations contained in this paragraph, denies the speculation contained in this paragraph, and denies any misconduct or wrongdoing.**

176. The City has paid out millions of dollars in settlements of lawsuits alleging unlawful traffic

and investigatory stops and illegal searches.

**ANSWER: Defendant City admits that it has settled lawsuits with allegations of unlawful traffic stops, investigatory stops, and searches. The City states the remaining allegations are vague, especially as to time-frame and are an incomplete characterization of the facts and circumstances and, therefore, the City denies the remaining allegations contained in this paragraph. Answering further, the City denies any misconduct or wrongdoing.**

177. As just one example, the City's Law Department recently agreed to pay the family of

Dexter Reed $1.25 million to settle their lawsuit arising from an illegal, pretextual stop of Reed by

Chicago police which resulted in the death of Reed and the wounding of an officer.

**ANSWER: Defendant City admits that a $1.25 million settlement related to the Dexter Reed incident was proposed and avers that said said proposal has not been approved by Chicago City Counsel. The City denies the remaining allegations contained within this paragraph and further denies any wrongdoing or misconduct.**

**Defendant Fuentes' Disciplinary History**

178. Defendant Officers have been disciplined for similar conduct in the past.

**ANSWER: Defendant City admits that certain Defendant Officers have been subject to**

disciplinary action in the past, but denies any characterization of such discipline as indicative of a pattern of similar conduct or as relevant to the claims in this case. As the remaining allegations are vague, the City denies them.

179.    On May 30, 2023, COPA sustained allegations against Defendant Fuentes and Sgt. Edward Ranzzoni of using profanity against a civilian at a traffic stop, unlawfully detaining the civilian, and unlawfully impounding the civilian's vehicle.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

180.    During the incident, Fuentes ordered the driver out of the car and handcuffed him, telling him his car would be towed. Fuentes yelled at the man, "Your $50,000 car is my car now! No no, it's my car now! It's my car now! My car now! My car!"

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

181.    Fuentes later claimed he searched the car because he smelled burnt cannabis. But the search yielded no narcotics or other contraband.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

182.    The officers issued the civilian a citation for parking in a tow zone, and ordered his car towed under a provision of the City of Chicago ordinances that authorized towing "[w]hen an unattended vehicle is parked illegally" in a marked tow zone.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

183.    The civilian was found "not liable" by the administrative law judge on his citation – presumably because his car was not unattended.

**ANSWER: Defendant City admits that the civilian was found "not liable" but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.**

184.    COPA recommended that Fuentes receive a 45-day suspension for his conduct.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

185.    COPA also recommended a 60-day suspension for Sgt. Ranzzoni, who, COPA noted,

"allowed Officer Fuentes to behave as if he felt he was entirely in charge rather than the sergeant. At one point, Officer Fuentes even seemed to give an order to his supervisor by saying, 'Sarge, tell him to get out of the car', to which instruction Sgt. Ranzzoni immediately complied."

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

186.    The Chicago Police Department concurred with COPA's findings but felt each officer should receive only a 10-day suspension.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

187.    On January 16, 2024, COPA sustained allegations that Defendant Fuentes "made insulting, mocking and belittling statements" toward two civilians at a traffic stop, and that he arrested a civilian and impounded his vehicle as retaliation for the civilian looking at Fuentes' identification.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

188.    At several points during the stop, Fuentes told the civilians that they were "ignorant as fuck" and commented to a fellow officer that one of the civilians was a "jag", which Fuentes later admitted was shorthand for "jagoff".

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

189.    When Fuentes observed the civilian looking at his star number and squad car, Fuentes said, "You are not going to size me up like that, looking at my star number and my vehicle number".

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

190.    The COPA investigator noted in his report that "[d]espite Fuentes claiming in his interview that he felt [one of the civilians] was disrespectful and did not respect their authority, only Fuentes is captured acting in a disrespectful manner."

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

191.    COPA recommended a 10-day suspension for Fuentes as a result of his conduct.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

192. On January 23, 2024, COPA sustained allegations that Defendant Fuentes and another officer used profanity and racist language toward African-American civilians during a traffic stop.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

193. During the traffic stop, Fuentes told another officer, "I'm tired of these fucking people acting like animals, dude", and referred to the civilians as "fucking animals".

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

194. Fuentes' conduct was captured on body-worn camera footage.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

195. COPA recommended a suspension of up to 30 days for Fuentes.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

196. On April 5, 2024, the Chicago Police Department concurred with COPA's findings and its recommended penalty of a 30-day suspension for Defendant Fuentes.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

**Defendant Tohatan's Disciplinary History**

197. On November 27, 2018, COPA sustained allegations that Defendant Tohatan engaged in an unjustified verbal altercation with a civilian, illegally searched the civilian's car, and improperly issued a citation to the civilian for no proof of insurance despite the civilian offering to show him proof of insurance on his phone.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

198. The incident began when Tohatan and another officer pulled the civilian over after doing a U-turn.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

199. COPA recommended a 7-day suspension for Defendant Tohatan.

**ANSWER: Defendant City admits the allegations contained in this paragraph.**

200.     On August 25, 2020, COPA sustained an allegation that Defendant Tohatan engaged in

verbal abuse.

**ANSWER: Defendant City admits COPA recommended sustaining allegations that Defendant Tohatan engaged in verbal abuse. Defendant City denies the remaining allegations truly and accurately reflect the facts and therefore denies the remaining allegations contained in this paragraph.  Moreover, Defendant City denies any characterization of such discipline as indicative of a pattern of similar conduct or as relevant to the claims in this case.**

201.     Tohatan was suspended for 5 days as a result of his misconduct.

**ANSWER: Defendant City admits the allegations contained in this paragraph. However, Defendant City denies any characterization of such discipline as indicative of a pattern of similar conduct or as relevant to the claims in this case.**

202.     On December 20, 2022, COPA sustained allegations that Defendant Tohatan engaged in

verbal abuse and profanity.

**ANSWER: Defendant City admits COPA recommended sustaining allegations that Defendant Tohatan engaged in verbal abuse and profanity. Defendant City denies the remaining allegations truly and accurately reflect the facts and therefore denies the remaining allegations contained in this paragraph. Moreover, Defendant City denies any characterization of such discipline as indicative of a pattern of similar conduct or as relevant to the claims in this case..**

203.     Defendant Tohatan was suspended for 5 days as a result of his misconduct.

**ANSWER: Defendant City admits Defendant Tohatan was recommended for suspension but denies that this paragraph truly and accurately represents the facts and circumstances as they occurred and therefore denies the remaining allegations in this paragraph as written. Defendant City further denies any characterization of such discipline as indicative of a pattern of similar conduct or as relevant to the claims in this case**

204.     On April 11, 2023, COPA sustained allegations that Defendant Tohatan engaged in an

undisclosed civil rights violation.

**ANSWER: Defendant City admits that COPA sustained certain allegations against Defendant Tohatan on December 29, 2019. Defendant City denies the paragraph truly and accurately represents the facts and circumstances as they occurred and therefore denies the remaining allegations contained in this paragraph.**

205.     Tohatan was reprimanded for his misconduct.

**ANSWER: Defendant City admits the allegations contained in this paragraph. However, Defendant City denies any characterization of such discipline as indicative of a pattern of similar conduct or as relevant to the claims in this case.**

206.     On December 14, 2023, COPA sustained allegations that Defendant Tohatan engaged in

undisclosed misconduct during a traffic stop.

**ANSWER: Defendant City admits that on COPA recommended sustaining allegations against Defendant Tohatan as it relates to misconduct during a traffic stop. The City denies the remaining allegations truly and accurately represents the facts and circumstances as they occurred and therefore denies this paragraph. Moreover, Defendant City denies any characterization of such discipline as indicative of a pattern of similar conduct or as relevant to the claims in this case.**

207.     On an unknown date, COPA sustained allegations against Defendant Tohatan of

Coercion Threat of Arrest/Charges Coerced Confession.

**ANSWER: Defendant City admits COPA sustained allegations against Tohatan for coercion threat of arrest/charges coerced confession. Defendant City denies the remaining allegations contained in this paragraph and denies any characterization of such discipline as indicative of a pattern of similar conduct or as relevant to the claims in this case.**

208.     The discipline cited above is just the tip of the iceberg when it comes to discipline against

Chicago police officer for unlawful stops and searches and verbal abuse of civilians.

**ANSWER: Defendant City admits that certain of the Defendant Officers have been accused of conduct similar to that alleged here and have been disciplined. Defendant City states the remaining allegations are vague, incomplete, and argumentative and, therefore, Defendant City denies the remaining allegations contained in this paragraph. Moreover Defendant City denies any characterization of such discipline as indicative of a pattern of similar conduct or as relevant to the claims in this case .**

**COUNT I – FEDERAL CLAIM**
**UNLAWFUL DETENTION**
**DEFENDANT OFFICERS**

209.     Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER: Defendant City realleges and restates its answers to the above paragraphs as though fully set forth herein.**

210.     Defendants Officers caused Desmen to be detained without reasonable suspicion or

probable cause to believe he had committed any crime or offense, in violation of the Fourth

Amendment to the U.S. Constitution.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

211.    Alternatively, Defendant Officers detained Desmen for an unnecessary and unreasonable amount of time under the circumstances.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

212.    As a proximate result of Defendants' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and emotional pain and suffering.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

**COUNT II – FEDERAL CLAIM**
**ILLEGAL SEARCH**
**DEFENDANT OFFICERS**

213.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER: Defendant City realleges and restates its answers to the above paragraphs as though fully set forth herein.**

214.    Defendant Officers searched Desmen's car without a warrant, without legal process, without his consent, and without probable cause or reasonable suspicion to believe the car contained evidence of a crime, in violation of the Fourth Amendment to the U.S. Constitution.

**ANSWER: Defendant City denies the allegations contained within this paragraph are a true, complete, and accurate representation of the entire facts of the incident as it occurred and further denies that there was no basis to search all areas of Plaintiff's car. Therefore, the City denies this paragraph as written.**

215.    As a proximate result of Defendants' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and emotional pain and suffering.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

216.    As a proximate result of Defendant Officers' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and emotional pain and suffering.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

40

## COUNT III – FEDERAL CLAIM
## EXCESSIVE FORCE
## DEFENDANT OFFICERS

217.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER: Defendant City realleges and restates its answers to the above paragraphs as though fully set forth herein.**

218.    The force used against Desmen by Defendant Officers, which included being yanked out of his car, having his arm pulled up behind his back, being handcuffed, being forcibly detained, and being threatened by Defendant Officers, was objectively unreasonable and unnecessary based on the totality of the circumstances, and was undertaken intentionally with malice, willfulness, and reckless indifference to Desmen's constitutional rights.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

219.    As a proximate result of Defendant Officers' misconduct, Desmen suffered loss of liberty, physical pain, fear, mental anguish, humiliation and emotional pain and suffering.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

## COUNT IV
## DENIAL OF EQUAL PROTECTION
## DEFENDANT OFFICERS

220.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER: Defendant City realleges and restates its answers to the above paragraphs as though fully set forth herein.**

221.    As described more fully above, Defendant Officers denied Desmen equal protection of the law in violation of his constitutional rights.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

222.    Defendant-Officers targeted Desmen not because they had any lawful or legitimate basis to approach him, detain him, or search his property, but because he was Black.

**ANSWER: Defendant City denies the allegations contained within this paragraph**

223.    The misconduct described in this count was motivated by racial animus and constituted purposeful discrimination.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

224.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

225.    The misconduct described above had a discriminatory effect and was motivated by a discriminatory purpose.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

226.    As a proximate result of Defendant Officers' misconduct, Desmen suffered loss of liberty, physical pain, fear, mental anguish, humiliation and emotional pain and suffering.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

## COUNT V – FEDERAL CLAIM
## FAILURE TO INTERVENE
### DEFENDANTS CARMEN, KITTRELL, and SUNDE

227.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER: Defendant City realleges and restates its answers to the above paragraphs as though fully set forth herein.**

228.    Defendants CARMEN, KITTRELL, and SUNDE knew that officers Tohatan, Fuentes and Vecchio were violating Desmen's constitutional rights and had a reasonable opportunity to intervene to prevent or mitigate Tohatan, Fuentes and Vecchio's unlawful conduct, but failed and/or refused to do so.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

229.    As a direct and proximate result of Defendants' failure to intervene, Desmen suffered loss of liberty, physical pain, fear, mental anguish, humiliation and emotional pain and suffering.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

**COUNT VI – STATE CLAIM**
**FALSE ARREST/WRONGFUL IMPRISONMENT**
**DEFENDANTS TOHATAN, FUENTES, VECCHIO, AND CITY OF CHICAGO**

230.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER: Defendant City realleges and restates its answers to the above paragraphs as though fully set forth herein.**

231.    Defendant Officers, and CITY OF CHICAGO, by and through its agents, Defendant Officers, restrained and/or arrested Desmen without having reasonable grounds to believe he had committed any crime or offense.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

232.    Alternatively, Defendant Officers, and CITY OF CHICAGO, by and through its agents, Defendant Officers, restrained and/or arrested Desmen for an unnecessary and unreasonable amount of time under the circumstances.

**ANSWER: Defendant City denies the allegations contained within this paragraph**

233.    As a proximate result of Defendants' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and emotional pain and suffering.

**ANSWER: Defendant City denies the allegations contained within this paragraph**

**COUNT VII – STATE CLAIM**
**BATTERY**
**DEFENDANTS TOHATAN, FUENTES, VECCHIO, AND CITY OF CHICAGO**

234.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER: Defendant City realleges and restates its answers to the above paragraphs as though fully set forth herein.**

235.    Defendant Officers, and CITY OF CHICAGO, by and through its agents, Defendant Officers, made contact with Desmen of an insulting or provoking nature without his consent or legal justification, thereby committing a battery.

43

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

236.    As a proximate result of Defendants' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and physical and emotional pain and suffering.

**ANSWER: Defendant City denies the allegations contained within this paragraph**

## COUNT VIII – STATE CLAIM
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## DEFENDANTS TOHATAN, FUENTES, VECCHIO, AND CITY OF CHICAGO

237.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER: Defendant City realleges and restates its answers to the above paragraphs as though fully set forth herein.**

238.    Defendant Officers, and CITY OF CHICAGO, by and through its agents, Defendant Officers, engaged in conduct that was extreme and outrageous, and intended to cause or recklessly or consciously disregarded the probability of causing severe emotional distress, and Desmen suffered severe emotional distress as a proximate result of Defendants' actions.

**ANSWER: Defendant City denies the allegations contained within this paragraph**

239.    As a proximate result of Defendants' misconduct, Desmen suffered loss of liberty, fear, mental anguish, humiliation and physical and emotional pain and suffering.

**ANSWER: Defendant City denies the allegations contained within this paragraph**

## COUNT IX – FEDERAL CLAIM
## POLICY AND PRACTICE
## CITY OF CHICAGO

240.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER: Defendant City re-alleges and restates its answers to the above paragraphs as though fully set forth herein.**

241.    Defendant Officers' unlawful conduct was directly and proximately caused in whole or in part by one or more interrelated de facto policies, practices, and/or customs of the Chicago Police Department and City of Chicago, and the City of Chicago was aware of and deliberately indifferent to

those constitutionally infirm policies.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

242.    As a proximate result of Defendant's misconduct, Desmen suffered loss of liberty, fear,

mental anguish, humiliation and physical and emotional pain and suffering.

**ANSWER: Defendant City denies the allegations contained within this paragraph.**

**COUNT X – STATE CLAIM**
**INDEMNIFICATION**
**DEFENDANT CITY OF CHICAGO**

243.    Each paragraph of this Complaint is incorporated as if restated fully herein.

**ANSWER: Defendant City realleges and restates its answers to the above paragraphs as though fully set forth herein.**

244.    At all relevant times, CITY OF CHICAGO was the employer of Defendant Officers.

**ANSWER: Defendant City admits the allegations contained within this paragraph.**

245.    Defendant Officers committed the acts alleged above under color of law and in the scope

of their employment as employees of the CITY OF CHICAGO.

**ANSWER: Defendant City admits that, at all relevant times, the Defendant Officers were acting under color of law and within the scope of their employment for the City. Defendant City denies the remaining allegations contained in this paragraph and, further, denies any misconduct or wrongdoing.**

246.    Illinois law provides that government entities are directed to pay any tort judgment for

any damages for which employees are liable within the scope of their employment activities.

**ANSWER: Defendant City admits that under certain circumstances and to the extent provided by law, it can be liable as principle for torts committed by employees acting within the scope of their employment. Defendant City denies that Plaintiff has fully and/or accurately stated the law; therefore, Defendant City denies the remaining allegations contained in this paragraph.**

247.    Should Defendant Officers be found liable on one or more of the claims set forth above,

Plaintiff DESMEN NORTHINGTON demands, pursuant to Illinois law, that their employer,

Defendant CITY OF CHICAGO, be found liable for any judgment plaintiff obtains against

Defendant Officers, as well as attorney's fees and costs awarded, and for any additional relief this

Court deems just and proper.

**ANSWER: Defendant City admits that under certain circumstances and to the extent provided by law, it can be liable as principal for torts committed by employees acting within the scope of their employment. Defendant City denies that Plaintiff has fully and/or accurately stated the law; therefore, Defendant City denies the remaining allegations contained in this paragraph.**

## AFFIRMATIVE DEFENSES

1. The City is not liable to Plaintiffs for any federal claim for which its employees or agents are not liable to Plaintiff. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

2. The City cannot be held liable for punitive or exemplary damages in any Section 1983 action brought against it directly or indirectly by the injured party or a third party. *City of Newport et al. v. Fact Concerts, Inc.*, 435 U.S. 247 (1981).

3. To the extent Plaintiff failed to mitigate any of his claimed injuries or damages, any verdict or judgment obtained by Plaintiff must be reduced by application of the principle that Plaintiff has a duty to mitigate, commensurate with the degree of failure to mitigate attributed to Plaintiff by the jury in the case.

4. As to any state law claims made by Plaintiff, the City is not liable to the extent that the decision as to what action to take with regard to Plaintiffs was a discretionary decision for which Defendant City and its employees are immune from liability. 745 ILCS 10/2-201.

5. To the extent any employee or agent of the City was acting within the scope of his or her employment, that employee or agent is not liable for his or her acts or omissions in the execution or enforcement of the law, unless such act or omission constitutes willful and wanton conduct. 745 ILCS 10/2-202.

6. The City is not liable to Plaintiff for any state law claims for which its employees or agents are not liable to Plaintiff. 745 ILCS 10/2-109.

7. As to Plaintiff's state law claims, the City is not liable to pay attorney's fees as "the law in Illinois clearly is that absent a statute or contractual agreement 'attorney fees and the ordinary expenses and burdens of litigation are not allowable to the successful party.'" *See Kerns v. Engelke*, 76 Ill.2d 154, 166 (1979) (citations omitted).

8. Indemnification is not a cause of action, but a theory of recovery. The indemnification provision does not create direct liability on the part of the City or its employees, but creates liability on the City to indemnify after a judgment has been recovered against an employee. See *Arnolt v. City of Highland Park*, 52 Ill. 2d 27 (1972); *Glover v. City of Chicago*, 106 Ill. App. 3d 1066, 107 (1982).

**JURY DEMAND**

The City respectfully demands a trial by jury for all issues so triable.

Dated: April 2, 2025                                    Respectfully submitted,


s/ *Leslie Wiesen*
**Leslie Wiesen**
*One of the Attorneys for Defendant City of Chicago*


Marion Moore, Chief Assistant Corporation Counsel
Simerdeep Kaur, Assistant Corporation Counsel
Leslie Wiesen, Assistant Corporation Counsel
City of Chicago Department of Law
Federal Civil Rights Litigation Division
2 North LaSalle Street, Suite 420
Chicago, Illinois 60602
(312) 744-2026 (Kaur)
(312) 744-5170 (Moore)
(312) 742-1842 (Wiesen)
Simerdeep.Kaur@cityofchicago.org
Marion.Moore@cityofchicago.org
Leslie.Wiesen@cityofchicago.org